FILED
2024 Apr-18  PM 02:54
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| **HOPE HOSPICE, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.:** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT

Plaintiff, Hope Hospice, Inc. ("Hope Hospice"), hereby files this Complaint against the United States of America. This matter arises from an erroneous assessment of tax liability against Hope Hospice by the Internal Revenue Service ("IRS").

## Parties

1.      Plaintiff, Hope Hospice, is an Alabama corporation having its principal place of business at 1100 East Park Drive, Suite 303, Birmingham, AL 35235.

2.      The Defendant is the United States of America.

## Jurisdiction and Venue

3.      Jurisdiction over this matter is conferred upon this Court by 28 U.S.C. § 1346(a)(1).

4.      Venue is proper in the Southern Division of the Northern District of Alabama pursuant to 28 U.S.C. § 1402(a)(2).

**Factual Background**

5.      Hope Hospice is a small provider of hospice services in Jefferson County, Alabama.

6.      Hope Hospice employs a number of individuals. It is required to report and pay quarterly Federal Insurance Contributions Act ("FICA") taxes based on its employees' total wages.

7.      On June 14, 2019, Hope Hospice entered into a contract with PBS PEO Services, LLC ("PBS") to provide staffing for the entirety of that year (attached as Exhibit A). Under the contract, PBS agreed to be responsible for the FICA taxes associated with PBS employees. (Ex. A at 3, ¶ 8(a)(i)(c)).

8.      Accordingly, Hope Hospice properly did not file FICA tax returns for 2020, as it had no FICA liability for that year.

9.      Despite this, the IRS alleged that Hope Hospice should have filed a FICA tax return for the first quarter of 2020, and "constructed" a tax return for that quarter (attached as Exhibit B).[1] This constructed FICA return assessed a liability of $104,296.08, despite the fact that Hope Hospice had no employees during that

---

[1] The IRS did not allege any FICA liability or construct FICA returns for the second, third, or fourth quarters of 2020.

period, and thus no FICA liability. (Ex. B at 1). Hope Hospice is unable to determine the IRS' basis for calculating this liability.

10.     The IRS has also assessed a total of $43,755.15 in penalties and interest against Hope Hospice, despite the fact that Hope Hospice had no FICA liability and was not required to file a FICA tax return for the first quarter of 2020. (Ex. B at 2). Moreover, these penalties and interested were calculated on the erroneously assessed liability from the IRS' constructed FICA return, rather than Hope Hospice's actual FICA liability of $0.

11.     Upon learning of the erroneous assessment, Hope Hospice contacted the IRS to remedy it. However, Hope Hospice encountered nothing but obstacles and delay in dealing with the IRS.

12.     An IRS agent, Catherine Brown, was initially assigned to Hope Hospice's case, but subsequently ceased communicating with Hope Hospice. After weeks of attempting to contact Ms. Brown, Hope Hospice learned that she had been reassigned to a different division. The IRS did not provide Hope Hospice with any notice of Ms. Brown's reassignment or with the identity of the agent who would be replacing Ms. Brown on Hope Hospice's case.

13.     Hope Hospice ultimately had to contact Ms. Brown's former manager to ascertain the identity of the new agent assigned to its case, Marilyn Toney.

However, many of Hope Hospice's communications to Ms. Toney went unanswered, despite promises that they would be responded to.

14.    As a result of these difficulties, Hope Hospice has also attempted to contact the local IRS Office, the regional IRS Collection Advisory Office, and even public IRS hotlines. Several individuals who responded were sympathetic, but none were able to help.

15.    On January 12, 2022, Hope Hospice paid in full the assessed FICA tax liability of $104,475.22.

16.    Since Hope Hospice began its communications with the IRS, the IRS has made a partial refund of $8,116.34 and waived $5.97 in interest.

17.    The IRS's erroneous assessment of Hope Hospice's FICA tax liability, penalties, and interest for the first quarter of 2020, minus the amount refunded or waived, totals $139,928.92.

18.    On August 17, 2022, Hope Hospice made a formal claim for refund by filing a Form 941-X amended FICA return for the first quarter of 2020 (attached as Exhibit C). This claim was received by the IRS, adequately informed the IRS in writing that a refund was sought, identified the period for which a refund was sought, and addressed the merits of Hope Hospice's dispute as required to satisfy 26 U.S.C. § 7422(a).

19.     More than six months have elapsed since this claim was made. The IRS has neither allowed nor disallowed these claim. Accordingly, the requirements of 26 U.S.C. § 6532(a)(1) have been satisfied.

## Count I—FICA and Withholding Tax

20.     Hope Hospice hereby incorporates the averments contained in paragraphs 1 through 19 as if restated more fully herein.

21.     The IRS erroneously assessed and collected FICA taxes against Hope Hospice as set forth above.

22.     Hope Hospice has filed a claim for refund of the FICA taxes for the first quarter of 2020 pursuant to 26 U.S.C. § 7422(a).

23.     More than six months have elapsed from the filing of Hope Hospice's claim for refund, and the claim has neither been allowed nor disallowed by the IRS.

24.     Hope Hospice has paid in full the entire amount of the FICA taxes assessed for the first quarter of 2020, including the erroneous assessment, fees, and interest included in this amount.

25.     The assessment and collection of FICA taxes were erroneous and illegal.

26.     Hope Hospice has overpaid its liability for FICA taxes and is entitled to recover from the Defendant the sum of $139,928.92, plus interest.

27.     Hope Hospice is the sole owner of its claim against the Defendant and has made no assignment of said claim.

WHEREFORE, Hope Hospice respectfully requests that this Court grant judgment against the Defendant in the amount of $139,928.92, together with costs and interest as provided by law, and for such other and further relief as this Court may deem appropriate.

Respectfully submitted,

*/s/ Robert S. Vance, III*
Robert S. Vance, III
*Attorneys for Hope Hospice, Inc.*

**OF COUNSEL:**

**DOMINICK FELD HYDE, P.C.**
1130 22nd Street South, Suite 4000
Birmingham, Alabama 35205
Tel.: (205) 536-8888
rvance@dfhlaw.com

**TO BE SERVED BY CERTIFIED MAIL**

Prim F. Escalona
United States Attorney for the Northern District of Alabama
1801 Fourth Avenue North
Birmingham, Alabama 35203

Internal Revenue Service
Department of the Treasury
Ogden, UT 84201

Jolene A. Lauria
Assistant Attorney General for Administration
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

# EXHIBIT A



# Client Service Agreement

**1.    THE PARTIES:** This Client Service Agreement ("Agreement") is made between **Hope Hospice Inc.** ("Client"), a (circle one: sole proprietorship, partnership, corporation, (S corporation) LLC or professional corporation) with its principal office located at the address shown beneath Client's signature on the final page of this Agreement and PBS PEO Services, LLC, an Alabama limited liability company, with its principal office located at 2189 Parkway Lake Drive, Birmingham, Alabama 35244 ( "PBS").

**2.    TERM OF AGREEMENT:** (A) After this Agreement has been executed by PBS's Chief Executive Officer or Vice President of PEO Services and an authorized representative of Client, it shall become effective on the first day of the first payroll period for which Client pays PBS's invoice covering Services, as defined in §3.C., for Co-Employees' hours that have been reported by Client and accepted by PBS, and shall remain in force for a term of one year, unless terminated earlier pursuant to §21. (B) If Client delivers to PBS on or before the first day of the first payroll period a non-refundable payment anticipated to cover the gross wages of Co-Employees and PBS Fees, as defined in §10, for the first payroll period, then this Agreement shall become effective upon receipt of such payment and shall remain in force for a term of one year, unless terminated earlier pursuant to §21. The occurrence of either (A) or (B) of this section shall constitute the Effective Date of this Agreement ("Effective Date"). Following the initial term, if the parties do not renew the Agreement for a fixed term or this Agreement is not earlier terminated pursuant to §21, this Agreement will automatically renew annually on each anniversary of the Effective Date.

**3.    CO-EMPLOYMENT SERVICES:**

   **A.  Client, PBS, and Co-Employees:**  The employment arrangement established under this Agreement will apply only in the states listed and priced in Schedule A, which is incorporated by reference.  Client's existing active employees and employees subsequently hired by Client in these states will become co-employed by both Client and PBS upon PBS's confirmation that they are co-employed ("Co-Employees").  If Client establishes a worksite in any area outside of such states ("Other Area"), this Agreement shall not apply in such Other Area until such time as Client has requested in writing and PBS has given written concurrence that services will be provided in such Other Area.  Consistent with Treasury Regulations at 26 C.F.R. Parts 301 and 602, Client shall at all times be the common law employer of Co-Employees but the entirety of an employer's rights and responsibilities shall be shared and allocated between PBS and Client as provided in this Agreement so that Co-Employees also shall be employed by PBS for specified, limited purposes.  PBS shall be the employer of Co-Employees only for the purpose of providing the Services, as defined in §3.C., and for purposes of compliance with the laws specified in §8.A of this Agreement.  Client shall be the employer of Co-Employees for all employer responsibilities for all employer responsibilities not specifically delegated to PBS in this Agreement.  PBS's retention of rights shall not be deemed a mandate to exercise any of such rights and does not negate Client's ability to exercise its rights and obligations as an employer.  Client shall at all times have the privilege, authority, and duty to exercise the rights and responsibilities that a worksite or common law employer has with respect to employees, including the rights assumed by PBS, subject to the requirements of this Agreement.  PBS reserves a right of direction and control over Co-Employees and retains authority to hire, terminate its employment of, and discipline and reassign, Co-Employees only as may be required under applicable law for PBS to fulfill its responsibilities under this Agreement.  However, PBS assigns to Client the actual control over (i) the day-to-day job duties of Co-Employees, and (ii) the portion of all job sites at which and from which Co-Employees work.  Client (a) accepts the assignment of actual control as provided in this Section, (b) understands that Client has actual control over Co-Employees' job duties and job sites at which and from which Co-Employees work, and (c) agrees that PBS is absolved of actual control over the Co-Employees' job duties and job sites at which and from which Co-Employees work.  Client has the right to hire, accept, or cancel the assignment of, and to terminate its employment of, any Co-Employee, only to the extent consistent with applicable law.  Client also has the right and obligation to supervise, direct, and control the Co-Employees in order to conduct its business, discharge fiduciary responsibilities, or comply with any federal, state or local licensure, regulatory, statutory, or other legal requirement.  Client is solely responsible for the quality, adequacy, and safety of all goods produced and services performed by the Co-Employees and for the consequences, including damage to property and injury to third parties, resulting from Co-Employees' acts committed during and within the line and scope of Client's business.  All decisions made and actions taken in furtherance of Client's business shall be the exclusive responsibility of Client; PBS shall bear no responsibility or liability for any action or inaction related to Client's business operations, even if Co-Employees implement the actions.

   **B.  Cooperation and Information Exchange:**  If PBS needs to make a decision regarding its employment of any Co-Employee, Client will provide the information necessary for PBS to make a reasonable and informed decision.  If PBS finds it necessary to conduct an investigation before making a decision, Client shall cooperate reasonably in that investigation.  If Client does not cooperate reasonably or provide requested information necessary for PBS to make an informed decision regarding a Co-Employee, Client will be fully responsible for the consequences of such action, inaction, or decision.  Client understands that no individual hired by Client will become a Co-Employee for whom PBS will provide Services, as defined in §3.C., until PBS issues an employee identification number after receiving required information and forms.  Also, under the laws referred to in §8.A., PBS must obtain and maintain certain documents produced by Co-Employees.  Client agrees to help facilitate the timely delivery of such documents to PBS.  It is understood that if required signed documents for an employee hired by Client are not timely received by PBS, or if PBS determines that an employee has submitted invalid documentation, then PBS may refuse to co-employ and provide Services for that employee or may exercise its right to terminate that employee's employment with PBS.

   **C.  PBS's Services:**  In furtherance of its responsibilities as a co-employer, PBS will, under its own employer identification numbers, (i) process payroll, pay wages, and make deductions that are legally required or duly authorized; (ii) collect, report, and pay applicable payroll taxes and keep payroll and tax records as required by federal, state, and local tax laws and regulations; (iii) comply with state and federal unemployment laws by maintaining accounts, paying unemployment insurance taxes, filing required reports and administering and managing claims (subject to the understanding that in certain states, Client's employer identification number will be used for all unemployment matters and, upon receiving Client's written authorization, PBS will

perform its responsibilities as Client's designated agent); and, (iv) administer employee benefits programs sponsored by PBS and selected by Client or its Co-Employees and provide other services as agreed to in Schedule A ("Services"). PBS assumes responsibility for the payment of legally required wages to Co-Employees without regard to payments by Client to PBS. Notwithstanding any assumption of liability as to the Co-Employees required by law, PBS reserves all rights under this Agreement and at law and equity to collect all amounts from Client due as required herein. Client and PBS agree to keep a copy of the Agreement in their respective corporate files. Under no circumstances will PBS provide any service, guidance, or decision on strategic, financial, operational or other matters concerning Client's business.

**D.   Notices to Co-Employees:**  PBS will give written notice of the relationship established between PBS, Client, and the Co-Employees as a result of this Agreement. Client understands that with respect to PBS, Co-Employees are at-will employees, and that the written notice to Co-Employees contains a statement that there is no written, verbal, or implied contract between PBS and a Co-Employee. When a Co-Employee's employment with Client ends for any reason, Client shall immediately notify PBS of the date the employment terminated and the reasons therefore so that PBS may timely remove the Co-Employee's name from its active records, promptly notify insurance carriers and other necessary third parties and otherwise comply with post-employment requirements related to its Services. If Client fails to timely notify PBS that a Co-Employee's employment has ended, Client agrees to reimburse PBS for any premiums and other costs attributable to that Co-Employee paid to third parties through the date PBS receives notice from Client. If this Agreement is terminated, PBS shall immediately notify all Co-Employees of that fact and shall inform them that they are no longer employees of PBS and will no longer be covered by PBS's benefits or insurance.

**E.   Payroll Reports:**  Client agrees that, since it controls the worksite and the scheduling and supervision of Co-Employees, and exercises the day-to-day direction and control over Co-Employees, Client will determine, verify, and accurately report to PBS, at the same times that payment information is reported to PBS pursuant to §12.A.: (i) the total number of hours worked by all Co-Employees and their exempt and non-exempt status; and (ii) the total remuneration due each Co-Employee for each payroll period in accordance with the Fair Labor Standards Act ("FLSA"), any applicable state or local law, and any agreement between Client and the Co-Employee. Client assumes all responsibility for the accuracy of such reports and the amount of remuneration due each employee. Client shall maintain records of hours worked by all Co-Employees throughout their tenure of employment and for a period of at least four years thereafter, and shall make such records available to PBS upon request. Client shall not withhold or authorize the withholding of a payment of wages absent express permission from a Co-Employee and shall not violate any applicable law pertaining to the payment of wages. Client shall not make any taxable payment of any kind, except profit sharing or pension plan distributions pursuant to the terms of a qualified plan, directly to any Co-Employee. Any owner or officer of Client enrolled as a Co-Employee must receive sufficient remuneration through PBS's system to satisfy PBS's minimum payroll requirement established from time to time. Client agrees to immediately forward to PBS any order or notice of garnishment, involuntary deduction, IRS lien, or other legal process received by Client affecting wages paid to Co-Employees and to sign such documents as are necessary to authorize PBS to act on Client's behalf in responding to such legal process. Client shall be solely responsible for all non-compliance penalties and liabilities resulting from Client's failure to timely forward such legal process to PBS or to sign required authorization documents.

**F.   Employment Qualifications and Prerequisites:**  If pursuant to state, local, or federal law, a Co-Employee is required to have or maintain a special license or to work under a supervisor who has or maintains a special license; Client will be responsible for verifying such licensure and providing the required supervision. Client is solely responsible for determining what qualifications are necessary to perform each job, for assuring that all Co-Employees have and maintain the ability and qualifications necessary to perform the essential tasks of their jobs, and for the consequences of its hiring, supervision, disciplinary and termination decisions. Client has the sole responsibility to recruit, screen, interview, review résumés and other documents submitted by job applicants, conduct appropriate background investigations, verify education, references and prior experience, determine job assignments, decide where and when employees work, provide necessary training and supervision, evaluate performance, carry out necessary discipline as appropriate and remove workers from jobs for which they lack the ability or qualifications to perform if they or the life or property of others are in danger because of the deficiency.

**G.   Loss Prevention:**  Client is responsible for the implementation and enforcement of all worksite procedures that may be necessary to prevent theft, misappropriation or embezzlement of Client's personal, real, or intellectual property.

**H.   Point of Contact:**  Prior to the Effective Date, Client shall give PBS the name of one or more individuals to be the initial contact(s) authorized by Client to report to, and receive from, PBS payroll and other confidential information regarding Client and Co-Employees. At such time as a designated contact is no longer authorized by Client to receive confidential information, Client shall notify PBS, and if necessary shall designate a successor contact.

**I.   Other Client Agreements:**  The co-employment relationship established by this Agreement shall not affect or be affected by any agreements between Client and Co-Employees, such as employment contracts, compensation agreements, confidentiality or non-compete agreements, agreements establishing terms and conditions of employment, agreements providing for severance pay, bonuses, profit sharing or commission payments, agreements creating rights and obligations between Client and Co-Employees, or any policies regarding paid time off or paid benefits. Client understands that PBS will not adopt or ratify any such agreements or policies and that Client is solely responsible for enforcing its rights and fulfilling its obligations under such agreements and policies.

**4.   ONLINE SERVICES:**  Certain Services may be accessed by Client and its authorized employees, participants, or beneficiaries through the Internet at a site provided by PBS ("PBS Online Services"). Client agrees to take commercially reasonable precautions to maintain the privacy of usernames and passwords for any PBS Online Services. In addition, Client acknowledges that security of transmissions over the Internet cannot be guaranteed. PBS is not responsible for: (i) Client's access to the Internet; (ii) interception or interruptions of communications through the Internet; or (iii) changes or losses of data through the Internet. PBS may suspend Client, Client's employee(s) or plan participant(s) use of PBS Online Services immediately, without notice, pending an investigation, if any breach of security is suspected. PBS's Online Services or Internet site(s) may contain links to other Internet sites. Links to and from a site to other third party sites do not constitute an endorsement by PBS or any of its subsidiaries or affiliates of such third party sites or the acceptance of responsibility for the content on such sites.

**5.   CLIENT INFORMATION:**  "Client Information" shall mean (i) payroll, benefits, human resources, and similar information provided by Client or its employees or plan participants, including transactional information; and (ii) any other information or materials provided by Client, regardless of form (e.g., images, graphics, text. etc.) to be included in any web-based PBS Online Services whether included therein by PBS on behalf of Client as a part of its setup or directly by Client or any of its employees or plan participants. The following provisions shall apply with respect to Client Information: (a) Client shall be solely responsible for the updating and accuracy of all Client Information; (b) Client hereby grants to PBS a non-exclusive, non-

transferable license to use, edit, modify, adapt, translate, reproduce, copy (including backup copies), and display the Client Information as reasonably necessary for PBS to perform the Services covered under this Agreement or, in the event PBS, in its sole discretion, elects Certified PEO status under the Small Business Efficiency Act ("SBEA"), to provide any reports and filings required of PBS necessary to comply with the SBEA and implementing regulations, including any reports or filings necessary to qualify as a Certified PEO with the U.S. Treasury and to apply for any credits applicable to Client's payroll taxes under the SBEA; and (c) Client acknowledges that, in making PBS Online Services available, PBS is not acting as an investment advisor, broker-dealer, insurance agent or intermediary, or a financial or benefit planner. PBS is only making available benefits information related thereto.

**6.     TRANSMISSION OF DATA:**  In the event that Client requests that PBS provide any Client Information or employee or plan participant information to any third party or to any non-U.S. location, Client represents that it has acquired any consents or provided any notices required to transfer such information and that such transfer does not violate any applicable law.

**7.     DATA/FILE PROTECTION:**  PBS will employ commercially reasonable storage (including backup, archive, and redundant data storage, on-site and off-site) and reasonable precautions to prevent the loss of or alteration to any Client Information in PBS's possession, but PBS does not undertake to guarantee against any such loss or alteration.

**8.     REGULATORY COMPLIANCE:**

   **A.     PBS's Duties:**  With respect to Co-Employees, PBS is responsible for and agrees to the following:  (i) all laws and regulations governing the reporting, collection and payment of federal and state payroll taxes on wages paid under this Agreement, including, but not limited to: (a) federal income tax withholding provisions of the Internal Revenue Code, (b) state and local income tax withholding provisions, if applicable, (c) Federal Insurance Contributions Act ("FICA"), (d) Federal Unemployment Tax Act ("FUTA"), and (e) applicable state unemployment tax laws, including managing claims, and (f) in the event PBS, in its sole discretion, elects Certified PEO status under the SBEA, all reports and filings regarding PBS and its Clients necessary to comply with the SBEA and implementing regulations; (ii) assist Client's compliance with applicable workers' compensation laws by (a) administering Client's workers' compensation insurance, and (b) assist Client in the completion and filing of required reports; (iii) all laws and regulations governing the garnishment of wages, provided that Client has forwarded the pertinent legal process and authorization to PBS; and (iv) all laws and regulations governing administration, procurement of, and payments for any employee benefits available through PBS or covered by this Agreement. Because of requirements imposed on PBS by certain laws, Client will be required to furnish PBS with certain information regarding its ownership structure and compensation packages of its principals and key executives.  Client warrants that, to the best of its knowledge and belief, such information will be correct.

   **B.     Client's Duties:**  With respect to Co-Employees, Client is responsible for and agrees to comply with the following:  (i) applicable workers' compensation laws including laws requiring employers to: (a) procure workers' compensation insurance, (b) cooperate with PBS in establishing and maintaining a drug-free workplace in accordance with a compliant Substance Abuse Policy, (c) provide, at Client's expense, and ensure use of personal protective equipment, as required by federal, state or local law, or as deemed prudent by PBS or Client's workers' compensation carrier, and (d) complete and file required reports; (ii) the Occupational Safety and Health Act ("OSHA") and related or similar applicable law; (iii) if applicable: government contracting requirements as regulated by law, as amended, including but not limited to: (a) Executive Order 11246 and corresponding executive orders and affirmative action regulations, (b) The Rehabilitation Act of 1973, (c) Vietnam Era Veterans' Readjustment and Assistance Act of 1974, (d) Walsh-Healy Public Contracts Act, (e) Davis-Bacon Act, (f) the Service Contract Act of 1965, (g) the False Claims Act, and (h) any similar federal, state, or local laws or regulations; (iv) professional licensing and liability; (v) fidelity bonding requirements; (vi) Internal Revenue Code §§414(m), (n), & (o)  (In this regard, Client agrees to integrate and coordinate the terms of any extant Client-sponsored benefit plans so that PBS's plans remain in compliance with all applicable laws); (vii) the Fair and Accurate Credit Transactions Act; (viii) the Worker Adjustment and Retraining Notification Act ("WARN")(Client agrees to notify PBS at least 65 days in advance of any event that would require notices under WARN); (ix) laws affecting assignment of and ownership of intellectual property rights including, but not limited to, inventions whether patentable or not and patents resulting therefrom,  copyrights and trade secrets; (x) laws affecting the maintenance, storage, and disposal of hazardous materials (Client is responsible for the completion and filing of IRS form 8027 (Employer's Annual Information Return of Tip Income and allocated Tips, if required for Client's business and Client shall properly maintain all material safety data sheets on an on-going basis during any term of this Agreement); (xi) all other federal, state, or local laws concerning the employer/employee relationship, wages, hours, benefits, fair employment practices, terms and conditions of employment, as amended, including, but not limited to: (a) the Fair Labor Standards Act, (b) the Equal Pay Act, (c) the Fair Credit Reporting Act, (d) the Employee Polygraph Protection Act, (e) the Immigration Reform and Control Act as further specified in §8.E, (f) the Uniformed Services Employment and Reemployment Rights Act, (g) Title VII of the Civil Rights Acts of 1964, (h) the Family and Medical Leave Act ("FMLA") as further specified in §8.C, (i) the Age Discrimination in Employment Act, (j) the Older Workers Benefit Protection Act, (k) the National Labor Relations Act, (l) the Americans With Disabilities Act (including provisions thereunder relating to the accessibility of Client's premises, non-discrimination, and reasonable accommodations), (m) the Pregnancy Discrimination Act, (n) the Genetic Information Nondiscrimination Act, (o) the Employee Retirement Income Security Act; (p) the Health Insurance Portability and Accountability Act, (q) the Health Information Technology for Economic and Clinical Health Act, and (r) the Patient Protection and Affordable Care Act ("ACA") as further specified in §15; (xii) all federal, state, and local laws requiring posting or providing of notices at the place of employment or hire; and (xiii) all laws and regulations governing garnishment of wages.

   **C.     Client's FMLA Obligations:**  The Client's relationship with PBS under this Agreement in no way affects the Client's status as a covered employer under the FMLA.  Any determination of Client's status under the FMLA will be determined without regard for its relationship with PBS. Client shall be solely responsible for compliance with all aspects of the FMLA and similar state and local paid and unpaid leave laws.

   **D.     Client's Adoption of PBS Policies:**  With respect to Co-Employees, PBS has developed and adopted certain policies and procedures regarding Client and Co-Employee compliance with state and federal law. These policies are provided in PBS's employee handbook. Client represents that it has duly adopted these policies and procedures in accordance with its internal rules and business structure.  Client will make reasonable efforts to comply with PBS's employee handbook and ensure that its employees also comply. Client further agrees that PBS may revise its employee handbook from time to time and that such changes will be duly adopted and enforced by Client.  No policy or provision of PBS's employee handbook constitutes a contract for employment of any kind.  The terms and conditions of this Agreement control the relationship of the parties and no policy or provision of PBS's employee handbook may be interpreted to alter any term or condition of this Agreement.

**E. Immigration Compliance:** All Co-Employees will be subject to the E-Verify system when and where required by any applicable law or as determined to be consistent with PBS's business practices in its sole discretion. PBS will submit newly hired Co-Employees to E-Verify on Client's behalf. When applicable, PBS will communicate any non-confirmation to Client and Client shall not allow any Co-Employee to perform work unless such Co-Employee has been confirmed eligible to work by E-Verify. PBS will not submit any newly hired Co-Employees to E-Verify if such Co-Employees are working outside of a jurisdiction where the use of E-Verify is required by applicable law.

**9.   CLIENT'S REPRESENTATIONS AND WARRANTIES:** PBS's obligations hereunder are conditioned upon Client's full and accurate disclosure of any and all information reasonably requested by PBS both before and after the execution of this Agreement. As of the effective date of this Agreement, Client represents and warrants the following:

**A.** All compensation for Co-Employees accrued prior to the effective date of this Agreement and for which Client or any third party is responsible and obligated has been paid in full;

**B.** To the knowledge of Client, neither Client nor any third party who provides or has provided PEO services, employee leasing services or personnel staffing services to Client, has any employment contract, written or verbal, with any Co-Employee;

**C.** There are no separate contracts, agreements, or arrangements existing with respect to Co-Employees as a group or individually which would bind or obligate Client;

**D.** Client shall notify PBS of the principal location of the work-site of each Co-Employee and each location where such Co-Employee performs services, and of any changes in such locations;

**E.** All pension, profit sharing, or other employee benefit plans existing at the effective date of this Agreement are current and in compliance with applicable law, and the execution of this Agreement shall not be deemed a breach under the terms of those plans;

**F.** Except as previously disclosed to PBS in writing, there is no action, suit, proceeding, or investigation pending, or, to the knowledge of Client, threatened against Client, related to the Co-Employees or the Client's employer/employee relationship with the Co-Employees or which may result in a material adverse change in the financial condition of Client or of any guarantor of Client's obligations under this Agreement. Client will advise PBS promptly upon the inception of any such action, suit, proceeding, investigation or threat thereof;

**G.** Client has not knowingly violated any applicable statute or regulation in any respect, which would adversely affect the Co-Employees or Client's employment relationship with the Co-Employees. Client is and shall remain in compliance with all statutes, regulations and executive orders regarding Co-Employees and employment practices including, but not limited to, federal, state and local employment laws. Client acknowledges that certain statutes, rules and regulations are based on the status of the employer, and that Client's status under one or more of such statutes, rules and regulations may change as a result of entering into this Agreement;

**H.** There are no collective bargaining agreements binding on Client or affecting employees who are or may become Co-Employees and that, to Client's knowledge, there are no pending or threatened organizing efforts affecting Client's employees or unfair labor practice charges pending or threatened against Client. Client understands and agrees that Client must notify PBS immediately upon any organizing efforts affecting Client that occur during any term of this Agreement;

**I.** Client is not a federal, state or local government contractor or subcontractor and that none of the Co-Employees perform work on government contracts, except as previously disclosed in writing to PBS. Client agrees to provide written notice to PBS prior to entering into any government contract. PBS is not and will not be a federal contractor and has no responsibility or liability for Client's federal contracts and Client remains responsible for all compliance under such contracts. If PBS accepts/continues to provide its Services to Client after notice, PBS will provide information and assistance to Client in relation to Client's federal contractor obligations; and

**J.** All Co-Employees employed by Client prior to the Effective Date of this Agreement are authorized to work in the United States consistent with the requirements of the United States Citizenship and Immigration Services ("USCIS") and E-Verify where required by applicable law, and they have provided documentary proof of such authorization as reflected on I-9 forms in the custody or under the control of Client. Furthermore, Client represents and warrants that all names and Social Security records of Co-Employees hired by Client prior to the Effective Date match, and that Client is without knowledge of any fact that would render any such Co-Employee ineligible under applicable law to work in the United States. If during the term of this Agreement, any Co-Employee's work authorization expires (such as through the expiration of a visa or work permit), Client shall prevent such Co-Employee from performing any further work until such Co-Employee's work authorization has been restored and verified consistent with USCIS and I-9 requirements. Client shall be solely responsible for any such restoration and verification. Client's failure to provide full and accurate information shall be a breach of this Agreement.

**10.   FEES:** The fees to be paid by Client for PBS's Services are listed on Schedule A, and subject to change by PBS from time to time ("Fees"). The Fees are based on information concerning Co-Employees' job classifications and remuneration supplied to PBS by Client and on the requirements, methods, and level of Services agreed upon by the parties. Client agrees that PBS has relied upon the information provided by Client for establishment of the Fees and as the basis for entering into this Agreement.

**11.   CLIENT DEPOSIT:** As a condition of the performance of its Services under this Agreement, PBS shall require a refundable deposit equal to one week of Client's estimated payroll and Fees or an irrevocable letter of credit acceptable to PBS equal to same. These moneys shall be held on deposit by PBS to guarantee performance of all terms, covenants and obligations of the Client under this Agreement. This amount may be adjusted from time to time at PBS's option upon written notice to Client. In the event that PBS must apply any part of the deposit to the payment of any invoice or other charges, Client agrees to replenish said deposit prior to the continuation of any Services. Subject to the terms and conditions of this Agreement, any remaining balance of said deposit shall be refunded within sixty (60) days following termination of this Agreement. The waiver by PBS of this requirement at any time shall not estop or act as a waiver of PBS's right to require a deposit at any subsequent time during the term of this Agreement.

**12.   PAYMENT:**

**A.**  Client will pay PBS the gross remuneration of Co-Employees, the Fees for Services, any employer contributions for optional benefits that Client has agreed to pay and for any other services PBS performs at Client's request, all of which will be invoiced on a periodic basis. PBS's right to receive the invoiced amount shall arise upon Client's receipt of each invoice, and the amount invoiced shall be due upon receipt. Any amounts not paid when due are subject to a late penalty of up to 1.5% of the amount due per month or fraction thereof that remains outstanding or such lesser amount that is the maximum late penalty allowed by state law.

**B.**  Client shall pay for PBS's Services with bank wire transfers, through automatic clearing house transfer ("ACH"), or other method acceptable to PBS. Payment shall have been made only when PBS has received final, irrevocable credit at its bank. If wire transfer is the agreed upon mode of payment, a $12.00 fee will be charged for each transfer. If Client pays PBS through an ACH that is dishonored, then Client shall pay PBS a service charge of up to $200.00 per ACH dishonored plus the applicable late penalty. Under no circumstances shall any amounts advanced by PBS to employees or third parties and which are not paid by Client on a timely basis, be deemed a loan to Client. Past due amounts are delinquent obligations.

**C.**  If Client defaults in paying the amounts due PBS and PBS continues to pay any wages to Co-Employees, Client shall fully indemnify and hold PBS harmless from any and all claims made by employees for wages in excess of the amount paid by PBS and all legal fees and expenses incurred in defense of such claims. If Client fails to fulfill its obligations as an employer under this Agreement or another agreement or any law or regulation and as a result of such failure PBS becomes obligated at any time to pay amounts due in satisfaction of Client's obligation, Client agrees to pay, upon receipt, PBS's invoice covering such amounts and any applicable costs or other fees. Unless otherwise specified, Client agrees to collect, verify, and transmit to PBS's principal office in Birmingham, Alabama by 12 o'clock noon (in Client's time zone) no less than 72 hours, or longer, as required by PBS before each PBS payroll date ("Reporting Time"), the information needed for the correct and accurate determination of the gross and net amounts due to Co-Employees and the payment due PBS. If Client transmits payroll information to PBS after the Reporting Time, Client agrees to pay PBS its applicable charges for the special handling required to process and timely deliver payroll to Co-Employees on the scheduled payroll date. Client must immediately inform PBS of any situation in which payment will not be made when due, and PBS shall have the right to immediately remove from its payroll the Co-Employees for whom payment will not be made and to require Client to immediately notify those workers of PBS's action.

**D.**  PBS may adjust its Fees if there are any statutory changes in the minimum wage, other significant employment law, employer taxes, sales tax, or Client's workers' compensation rates which must be paid during any term of this Agreement or which applies to the time period during which this Agreement was in effect; such adjustments shall be effective on the date of the mandated change. PBS's Fees may also be adjusted if the Client information is or becomes inaccurate, if Client requests changes in the requirements, methods, and levels of Services agreed upon, if Client frequently transmits payroll information after the reporting time, if there are variations in the number of Co-Employees or their gross payroll, or within 30 days of any anniversary date of this Agreement if in PBS's sole discretion the Fees then being charged become insufficient to maintain a consistent level of Services. All such adjustments shall be effective upon reasonable advance notice from PBS.

**E.**  Client authorizes PBS during any term of this Agreement to conduct credit and background reference checks on Client and the owners of Client to verify Client's creditworthiness and reliability to perform its obligations under this Agreement.

**13.   WORKERS' COMPENSATION:**

**A.  Insurance Coverage:**  Beginning with the effective date of this Agreement and until its termination, it shall be Client's sole and exclusive obligation to provide acceptable workers' compensation insurance to all Co-Employees in compliance with applicable law. Client agrees to report its newly hired employees to PBS on or before the date they are hired by sending to PBS PBS's "New Hire Acknowledgement Package" completed and signed by that worker and Client. Client shall require the "labor contractor endorsement", NCCI Form WC 00 03 20 A, to be attached to the workers' compensation policy identifying PBS as the labor contractor. Client agrees to require its sub-contractors and independent contractors (jointly, "Contractors") to provide, before starting work, evidence of workers' compensation insurance. Client shall indemnify and hold PBS harmless from claims, damages, expenses, and liability arising from and related to (i) employing workers by utilizing procedures that are inconsistent with the requirements set forth in this Agreement; and (ii) unilaterally terminating the employment of an insured Co-Employee in contravention of applicable law. To the extent that any federal or state reporting or filing obligations are required due to Client's workers' compensation program, including, but not limited to Medicare Secondary Payer Section 111 reporting requirements, Client's workers' compensation insurer or Client and not PBS shall be responsible for any such reporting or filing obligations.

**B.  Administration of Coverage:**  At Client's request and only where provided among the Services, PBS will administer Client's workers' compensation insurance during the term of this Agreement. If so requested, Client shall appoint PBS "Limited Power of Attorney" for the purpose of said administration and said appointment will, unless otherwise agreed to in writing, include but not be limited to (i) negotiating workers' compensation premium on Client's behalf, (ii) payment of the deposit premium and down payment from PBS's own funds; (iii) payment of monthly invoices; (iv) receiving first reports of injury from Client; (v) submitting first reports of injury to client's workers' compensation carrier; and (vi) receiving and replying to correspondence from the respective carriers. If for any reason during the term of this Agreement Client's workers' compensation insurance should be assigned to a state risk pool or equivalent, Client will be responsible for the initial deposit and down payment.

**C.  Certificates:**  Client shall maintain the insurance required under §13.A. & B. during the term(s) of this Agreement. Client will cause its workers' compensation carrier to issue a certificate of insurance which evidences coverage, names PBS as a certificate holder and allows not less than 30 days' notice of cancellation or material change. Client assumes full responsibility for workers' compensation claims, benefit claims (including but not limited to health insurance claims and pension claims), tax obligations, employment discrimination claims, general liability claims, third-party claims, and any and all other obligations or claims pertaining in any way to any individual for whom payroll information is not supplied during any payroll period (except as may be required by law), or who is paid in whole or in part by Client, as an employee, independent contractor, or in any other capacity. In no event will any independent contractor be covered by Client's workers' compensation policy without written approval from said carrier.

**D.  Notification of Injury; Reinstatement of Workers:**  If a Co-Employee is injured at an assigned worksite, Client agrees to notify Client's workers compensation insurance carrier or PBS (if PBS is administering Client's workers compensation insurance) by the completion of a "First Report of Injury Form" within 24 hours and to cooperate in any investigation conducted following the injury, to provide transportation to an approved medical facility, and if required due to medical restrictions, to permit the Co-Employee (where reasonably possible and permitted by law) to work in a modified-duty capacity until such time as the employee is no longer medically restricted from resuming duties performed prior to the injury. Client also agrees to cooperate with PBS in making reasonable accommodation, which may be required by applicable law and in restoring a Co-Employee to his or her job at

the conclusion of any such leave. Client is solely responsible for all direct and indirect costs associated with reasonable accommodations required by the ADA and similar state and local laws.

**E. Safety:** PBS shall retain a right of direction and control over the management of safety, risk, and hazard control involving Co-Employees performing work at Client worksite(s) as may be required by local, state, and federal laws, ordinances, and regulations; however, compliance with all applicable laws, ordinances, and regulations related to such matters is the responsibility of Client. Client agrees that it is responsible for maintaining a safe working environment, and shall provide, at its expense, all necessary personal protective equipment and training required under federal or state law or regulations and shall establish and maintain such safety programs, safety policies and safety committees as may be required by law. PBS, PBS's liability insurance carrier and Client's workers' compensation carrier or their assignees have the right to survey Client's worksite to look for unsafe conditions or unsafe acts which may lead to accidents. However, the retention by PBS of the right to survey Client's worksite does not relieve Client of any obligations that it has pursuant to Federal or State OSHA or any other federal, state or local law intended to provide employees at Client's worksite with a safe work environment. Upon notification by PBS to Client of an unsafe working condition, Client shall within a reasonable period of time take necessary steps to rectify the unsafe condition or correct the violation. Client agrees to indemnify and hold harmless PBS for any and all citations, including fines and legal expenses incurred as a result of safety issues of Client, Client's worksite and Co-Employees.

**F. Workers' Compensation Class Codes:** Workers' compensation class codes are based on information provided by Client to the workers' compensation carrier. It shall be Client's sole responsibility to assign Co-employees to workers' compensation class codes. Client warrants that the workers' compensation classifications as set forth on the New Employee Information Sheet is accurate and complete and that Co-Employees performing these job functions do so at the location specified in this Agreement as Client's address or at other such location as are set forth on Schedule A. Client understands and agrees that prior written approval must be obtained from PBS and Client's workers' compensation carrier prior to the addition of any workers' compensation classification or location to this Agreement. PBS retains the right to change the classification codes, where necessary, to comply with the guidelines set forth by the NCCI or applicable state regulatory agency.

**G. Inspection:** Client agrees that PBS, Client's workers' compensation insurance carrier, or an authorized representative of either is entitled to conduct an on-site physical examination at each Client location at least annually during the term of this Agreement, and periodically thereafter, to audit the employee classification list, employee rolls and financial records relating thereto to make sure that all Co-Employees are classified properly, and being reported for workers' compensation purposes and that all of their remuneration is being reported to PBS. If PBS is administering Client's workers' compensation insurance and learns during an audit or otherwise that Co-Employees have been misclassified or all of their hours and remuneration have not been reported to PBS, Client will promptly reimburse PBS, upon invoice for charges which otherwise would have been payable by Client had all of the hours, remuneration and job classifications of Co-Employees been properly reported, plus a service charge equal to 25% of such charges or such lesser amount that is the maximum service charge allowed by state law.

**H. Termination of Client's Workers' Compensation Insurance:** Upon notice of failure of Client to carry workers' compensation insurance, PBS will terminate this Agreement immediately. In the event this Agreement is terminated for any reason, Client agrees that, if paid by PBS from its own funds, any workers' compensation down payment(s), deposit(s), credits or unearned premium(s) shall be the property of PBS, and Client hereby appoints PBS as "Attorney-in-fact" for the purpose of endorsing any refund check(s) issued by Client's workers' compensation insurer. In the event such refund is to be in the form of a credit, Client agrees to reimburse PBS within ten (10) days after the termination of this Agreement. Client understands that some carriers charge a penalty in the form of a "short rate" or other form for early termination of coverage and that Client will be responsible for reimbursing PBS for such penalties. If PBS has paid workers' compensation deposit(s) or premiums in excess of the amount PBS has actually collected from Client, Client agrees that the full amount, including any penalties, will be added to Client's final invoice and is due upon receipt of invoice.

**I. Replacement Coverage:** In the event this Agreement is terminated, Client agrees to immediately make arrangements with PBS to continue the then current workers' compensation insurance or to immediately secure replacement workers' compensation insurance for the benefit of employees who continue their employment with Client.

**14.   SUPPLEMENTAL SERVICES:** From time to time PBS may participate in joint marketing promotions with vendors whose services will be offered to clients of PBS. Client agrees that (i) PBS is not the provider of such supplemental services, (ii) PBS shall have no responsibility or liability for services provided by any vendor, and (iii) if Client does elect to utilize services of a vendor, Client will look solely to the vendor for performance and liability with regard to such services. These are not included in PBS's basic Services provided under this Agreement. Such services would be provided by a vendor under separate contract between vendor and Client and would be billed separately, if applicable.

**15.   HEALTH AND WELFARE BENEFITS:**

**A.** If Client is or hereafter becomes subject to any provision of the ACA, as measured according to the guidelines of the ACA, Client is solely responsible for all compliance with the ACA applicable to Client, including without limitation, plan design, maintenance, eligibility, participation, affordability, benefits and formulary, offers of coverage, tracking initial measurement periods, standard measurement periods, or stability periods, providing plan notices and plan documents, and making appropriate filings and reports as required under ACA or related employee benefits laws, where applicable.

**B.** PBS may, in its sole discretion, offer Client the opportunity to adopt employee benefit plans offered by PBS, if any, to meet the requirements of the ACA. Any such offer by PBS will be in writing to Client and any selection by Client also shall be in writing and the provision of benefits subject to that selection shall be identified in Schedule A attached hereto. No PBS employee benefit plans will be offered to Co-Employees without Client's prior authorization. All of PBS's employee benefit plans shall be subject to the terms and conditions of eligibility provided for in the applicable plan documents, including any amendments. Unless the opportunity to participate in PBS's employee benefit plans is provided to Client pursuant to the Schedule of Benefits, Co-Employees shall not be eligible for PBS's employee benefit plans. Unless access to PBS's employee benefit plans is provided pursuant to the Schedule of Benefits, PBS shall have no responsibility to Client or any Co-Employee for maintaining compliance with the ACA. If PBS has offered to make some or all of its employee benefit plans available to Client to elect to offer such benefits to Co-Employees, as provided pursuant to the Schedule of Benefits, such offer is intended to be construed as an offer made on behalf of Client, consistent with ACA's safe harbor applicable to same under 26 C.F.R. § 54.4980H-4(b)(2). Client and PBS agree that PBS is not a seller of insurance and does not engage in the sale of insurance.

**C.** If Client accepts PBS the offer for Client to adopt PBS employee benefit plans and offer such plans to its Co-employees, Client understands and acknowledges that PBS may receive from third parties, including the insurance carriers for such plans, commissions and other compensation with respect to those plans and services PBS provides thereto. With respect to decisions to select PBS as the broker for the plan, PBS is not the fiduciary of the

plans. Instead, fiduciary duties with respect to such decisions have been delegated to Client and other Clients of PBS who are participating in the plans. For purposes of carrying out these fiduciary duties, Client may request information from PBS, including information about other PBS Clients participating in the plans. By agreeing to adopt PBS employee benefit plans and offer such plans to its Co-employees without objecting to PBS being the broker for the plans or otherwise providing services to the plans for which it receives commissions and other compensation, Client exercises the fiduciary duty discussed in this paragraph and selects PBS as the broker and provider of other services PBS provides to the plans.

**D.**   Client may, in its sole discretion, elect to offer its own medical benefits to Co-Employees.  If Client offers its own medical benefits to Co-Employees in accordance with the preceding sentence, Client understands and acknowledges that: (i) PBS will administer only deductions for Co-Employees for the plan(s), according to a separate signed Agreement, and relies on information supplied by Client and participants in doing so; (ii) eligibility and participation requirements are the absolute responsibility of Client; (iii) PBS is not a fiduciary to Client's plan(s), any participant thereof, or any assets of the plan(s); (iv) the benefit plan sponsored and administered by Client will be under a "Section 125" plan under the Internal Revenue Code and any request to cancel, enroll, or change benefits coverage outside of the annual enrollment period must be in compliance with applicable plan documents and Section 125; (v) an "Employee/Co-Employee" for purposes of the cafeteria plan regulations does not include an independent contractor, self-employed person, a 2 percent shareholder in an S corporation, or a partner; (vi) PBS shall cooperate with Client to ensure that timely and accurate reports are filed and provided under ACA §§ 6055 and 6056; however, Client shall be responsible for providing any such reports to Co-Employees and to applicable government agencies; and (vii) Client shall be responsible for COBRA continuation for participants, 5500 filings, and similar federal and state filings under any group health plan sponsored by Client.  Client agrees that it is Client's responsibility to fulfill all obligations under any Client sponsored plan(s) and to notify PBS of any changes or cancellations when they occur. Likewise, if Client offers its own medical benefits to Co-Employees, Client shall indemnify, hold harmless, protect and defend PBS from all claims, damages, costs, penalties, taxes, interest, or other liability (including without limitation, any penalty assessed under § 4980H of the Internal Revenue Code) assessed against Client or PBS arising out of the Client's sponsorship of its own medical benefits to any and/or offering same to Co-Employees, including without limitation:  (1) the Client's administration of any employee benefit plan; (2) compliance with ACA; and (3) compliance with the Employee Retirement Income Security Act of 1974, as amended, the Internal Revenue Code, or any other federal, state, or local law that governs employer-sponsored employee benefit plans.

**E.**   If PBS sponsors any medical or supplemental health plans that are subject to COBRA and offers such plans to Client and its Co-Employees, Client is responsible for and hereby agrees to comply with the following: (a) Client must provide complete, accurate, and timely information so that PBS can fulfill any COBRA administration tasks; (b) Client understands and agrees to abide by all federal and state statutes requiring employer subsidized or paid coverage through the end of the month in which the employee separates from employment or until certain notice is given to the health insurer; and (c) Client agrees to indemnify and hold harmless PBS for providing inaccurate or untimely information related to COBRA.

**16.**   **PAYMENTS FOR HEALTH AND WELFARE BENEFITS:** If Co-Employees enroll in Health & Welfare or other available employee benefits programs, Client understands and agrees that if PBS is unable to collect premiums or amounts due from Co-Employees (i) Client will pay PBS such uncollected amounts upon receipt of PBS's invoice; (ii) PBS will, upon a Co-Employee's return to work, deduct the amount billed to Client and credit same to Client's next invoice, or (iii) if Co-Employee terminates employment, deduct any unpaid amount from Co-Employee's final check and credit same to Client.  Client will inform Co-Employees of the requirements set forth in this section.

**17.**   **RETIREMENT PLANS:**  Pursuant to the Schedule of Benefits, PBS may offer Client and Co-Employees the opportunity to participate in a multiple employer 401k plan. If Client does not adopt PBS's 401k plan and offers any other 401k, Roth 401k, 403b, IRA, Simple IRA, Roth IRA, SARSEP, SEP, or other retirement plan, Client understands and agrees that: (i) PBS will administer only deductions for Co-Employees for the plan(s), according to a separate signed Agreement, and relies on information supplied by Client and participants in doing so; (ii) eligibility and participation requirements are the absolute responsibility of Client; and (iii) PBS is not a fiduciary to any participant of Client's plan(s) or any assets of the plan(s).

**18.**   **OTHER INSURANCE:**

**A.   Automobile:**  Client shall obtain and maintain automobile liability insurance for all owned, non-owned, and hired vehicles used in connection with its business, with the work performed on its premises or where any Co-Employee is permitted or required to operate a vehicle of any kind for Client. The policy shall insure against liability for bodily injury and property damage, with a minimum combined single limit of $1,000,000.00 and Uninsured Motorist or PIP equivalent coverage of at least the minimum limits required by a state having a "no fault" law.

**B.**  **General Liability:**  Client shall obtain and maintain general liability insurance with a minimum combined single limit of $1,000,000.00 with the following coverage, where applicable: premises, operations, products, completed operations, contract and broad form property damage, independent contractors, personal injury, host liquor, and full liquor liability.  If Client renders professional services, it shall obtain and maintain professional liability coverage, as applicable, with a minimum combined single limit of not less than $1,000,000.00. With regard to insurance referenced in this paragraph, additional coverage may be purchased at PBS's discretion based on size and nature of Client's business.

**C.**  **Certificates:**  The insurance required under §18.A. and B shall be maintained by Client during the term(s) of this Agreement.  Client will cause each of its insurance carriers to issue a certificate of insurance which evidences coverage, names PBS as an additional insured, and allows not less than 30 days' notice of cancellation or material change.

**D.**    **Claims:**  If any third party initiates a claim against Client or PBS for bodily injury, property damage, or death, or if a Co-Employee files a claim against Client or PBS for any type of loss, injury, or damage, including without limitation wrongful discharge, employment discrimination, harassment, or retaliation, Client shall immediately notify PBS and cooperate and assist PBS in the filing of any applicable claim with PBS's insurance carriers or file for recovery under Client's own applicable insurance policy. Client is required, and agrees, to timely report to PBS all complaints, allegations, or incidents of any tortious misconduct or workplace safety violations, regardless of the source. As a condition of PBS providing the Services, Client agrees to obtain and maintain employment practices liability ("EPL") insurance for the benefit of Client and PBS. Client understands and agrees that EPL-covered claims may include without limitation:  claims for wrongful discharge, employment discrimination, harassment, and retaliation. Claims for violations of any federal, state, or local wage and hour law generally are not covered. A copy of Client's EPL policy will be made available to Client. Client agrees to refer to the policy for any terms and conditions applicable to Client's business and to familiarize itself with its obligations related to timely submission of claims.  If any provision of this Agreement is in conflict with the EPL policy in effect, the EPL policy shall control. PBS retains the sole discretion over choice of EPL insurance carriers and the terms of such policies. If Client's EPL carrier accepts a claim submitted by Client or PBS on Client's behalf, Client agrees

that Client shall be solely responsible for the payment of any applicable deductible or self-insured retention ("Deductible") and PBS or counsel appointed to defend Client from such claim shall be entitled to collect from Client the full sum of its Deductible upon the appointment of counsel for defense with such sum to be held either as a retainer or to be billed to the Client and remitted by the Client as such fees are incurred. PBS shall have the discretion to determine whether the Deductible shall be paid as retainer or paid as such fees are incurred. If PBS requires Client to remit its Deductible to be held as a retainer, such retainer will be held by appointed counsel in trust, against which legal fees incurred shall be deducted. In the event of a resolution of a claim prior to the exhaustion of the Deductible, the balance of such unexhausted Deductible shall be returned to the Client.

**19.    INSURED CLAIMS:** Each party hereby waives any claim in its favor against the other party by way of indemnification or otherwise which may arise during the term(s) of this Agreement for any and all loss of or damage to any of its property or for bodily injury, which loss, damage, or bodily injury is covered by insurance to the extent that such loss or damage is recovered under such policies of insurance as required herein. Client hereby waives any right of subrogation in favor of PBS.

**20.    DUTY TO COOPERATE:** If an employee, Co-Employee, government agency, or other third party files any complaint, claim, charge, agency audit, or lawsuit against PBS, Client, or both, alleging violation of a law or failure to do something required by law, each party shall cooperate with the other's defense of such complaint, claim, charge, agency audit, or lawsuit. PBS and Client will make available to each other upon request any and all documents that either party has in its possession which relate to any such complaint, claim, charge, agency audit, or lawsuit. However, neither party shall have the duty to cooperate with the other if the dispute is between the parties themselves, nor shall this provision preclude the raising of cross claims or third party claims between Client and PBS. This duty to cooperate shall encompass the obligation of each party to timely supply documents, witnesses, and such other evidence as is necessary for a party to properly fulfill its obligations under this Agreement.

**21.    TERMINATION:**

   **A.**   Upon the end of each one-year term, this Agreement is terminable by either party without cause upon 30 days' written notice in advance of the anniversary of the Effective Date. In the event of a breach, violation or default of any term or condition of this Agreement ("Breach") by one party, the other party shall have the absolute right to immediately terminate this Agreement by giving written notice of termination to the party in Breach. At the option of the non-Breaching party the termination date shall be the date of the Breach, the date it sends notice, the date notice is received by the Breaching party, or any later date selected by the non-Breaching party.

   **B.**   In addition to any other Breach, the following shall be deemed Breaches giving rise to the non-Breaching party's right of termination (i) a party's failure to pay any monies when due as required by this Agreement; (ii) a party's failure to secure and maintain any insurance required by this Agreement; (iii) situations where a party (a) would be required to issue a notice under WARN, (b) closes or sells a facility or operation, (c) transfers its business to a third party, or (d) a party's current equity owners fail to maintain at least a majority ownership in the party; (iv) the filing of a petition for reorganization, bankruptcy, receivership, or insolvency by or against a party or if a party makes any assignment for the benefit of creditors; (v) Client's misrepresentation of employees' job descriptions or workers' compensation classifications, reporting of inaccurate employment rolls, employee payroll hours, pay rates or salary, or paying remuneration directly to Co-Employees without reporting same to PBS; (vi) Client's failure to comply with any reasonable directive regarding health and safety from PBS, Client's workers' compensation carrier, or any government agency; (vii) Client's failure to report payroll to PBS for one or more payroll periods; or (viii) if the number of employees reported by Client for three or more consecutive payroll periods declines more than 25% below the average number of employees in the periodic payroll reported by Client during the previous 12 months.

   **C.**   In the event of a Breach by Client, Client shall forfeit its deposit as liquidated damages in addition to paying any amounts due and owing at the time of Breach. If PBS waived the deposit required in §11, liquidated damages will be assessed at the amount of $5,000 at the time of Breach in addition to paying any amounts due and owing at the time of Breach.

   **D.**   Upon the termination of this Agreement for any reason: (i) PBS's status as an employer and its obligation to provide Services or any optional benefits or services to Client or Co-Employees shall cease on the date this Agreement terminates. Client shall be obligated to pay to PBS the full amount of PBS's invoices covering periods through the termination date for Services and any other amounts Client has agreed under this Agreement to pay to PBS; unpaid amounts shall continue as obligations of Client beyond the termination of this Agreement; and (ii) Client shall immediately assume (a) all federal, state, and local obligations of an employer to the employees, and (b) full responsibility for payroll, taxes, unemployment insurance and workers' compensation insurance. If the affected employees are entitled to the payment of any remuneration or pay for accrued vacation, sick or personal leave, or other benefits accrued prior to the termination date, Client shall be liable for the payment thereof. Client shall make payments directly to the employees; however, if PBS pays employees any such amounts, Client shall reimburse PBS.

**22.    CONFIDENTIALITY:** During the term of this Agreement, the parties may exchange certain confidential information, including without limitation all non-public information of a confidential or proprietary nature provided by the disclosing party to the receiving party for use in connection with the Services; PBS's trade secrets, proprietary information, pricing, processes, policies, forms, and materials or documentation related thereto, and documents or data received, created, or maintained by PBS in the performance of the Services; and Client's trade secrets, proprietary information, personally identifiable payroll information and employee-level data ("Confidential Information"). Confidential Information shall not include: (a) information that is already known by the receiving party, (b) information that becomes generally available to the public other than as a result of disclosure by the receiving party in violation of this Agreement, and (c) information that becomes known to the receiving party from a source other than the disclosing party on a non-confidential basis. All Confidential Information disclosed by one party to the other during any term of this Agreement will remain the exclusive and confidential property of the disclosing party. The receiving party will not disclose the Confidential Information of the disclosing party and will use at least the same degree of care, discretion, and diligence in protecting the Confidential Information of the disclosing party as it uses with respect to its own confidential information. The receiving party will limit access to Confidential Information to its employees and authorized representatives with a need to know and will instruct them to keep such information confidential. The receiving party may disclose Confidential Information of the disclosing party as follows: (a) to the extent necessary to provide Services under this Agreement, provided that any disclosure to a third party is made in confidence if such disclosure was not requested by the disclosing party; (b) to the extent necessary to comply with any law, rule, regulation, or ruling applicable to it; (c) as appropriate to respond to any summons or subpoena or in connection with any litigation; (d) relating to a specific Co-Employee, to the extent such employee has consented to its release; (e) to any affiliate of the disclosing party covered by this Agreement; and (f) to the extent necessary to enforce its rights under

this Agreement. Upon the request of the disclosing party, the receiving party will return or destroy all Confidential Information of the disclosing party that is in its possession. However, PBS may retain information for the purposes of regulatory compliance or in back-up files, provided that PBS's confidentiality obligations hereunder continue to apply

**23.     NON-SOLICITATION:** During the term of this Agreement and for one year thereafter, each party shall not knowingly hire or solicit the employment of any employee of the other party. However, nothing herein shall prevent a party from advertising vacant positions in the ordinary course of business where such advertising is not directly aimed at the other party's employees.

**24.     INTELLECTUAL PROPERTY RIGHTS:** Client shall own all intellectual property rights incident to all processes, products, or inventions created or invented by any Co-Employee who was directed by Client to create or develop such process, product, or invention. Client shall bear all costs associated with any patents, copyrights, or trademarks that Client chooses to obtain to protect Client's intellectual property rights.

**25.     INDEMNIFICATION:**

**A.**  PBS agrees to indemnify, hold harmless, protect, and defend Client, all of Client's subsidiaries, affiliates, and parent entities and their partners or shareholders, agents, attorneys, insurers, re-insurers, and employees from all claims, out-of-pocket expenses, reasonable attorney's fees and court costs, damages (including compensatory and punitive damages) and liabilities arising from or related to (i) acts, errors, or omissions, (whether negligent or willful) by PBS while performing Services under this Agreement; (ii) violations of any statute, law, or regulation by PBS; or (iii) PBS's failure to perform any of its obligations under this Agreement.

**B.**  Client agrees to indemnify, hold harmless, protect, and defend PBS, all of PBS's subsidiaries, affiliates, and parent entities and their partners or shareholders, agents, attorneys, insurers, re-insurers, and employees from all claims, out-of-pocket expenses, reasonable attorney's fees and court costs, damages (including compensatory and punitive damages) and liabilities arising from or related to (i) acts, advice, errors, or omissions (whether negligent or willful) by Client or by a Co-Employee while performing services in furtherance of Client's business; (ii) violations of any statute, law, or regulation by Client or a Co-Employee; (iii) breaches of contract attributed to Client or to a Co-Employee; (iv) Client's failure to perform any of its obligations under this Agreement; or (v) failure by Client to authorize or make payments due to Co-Employees under any law or under a policy or agreement with Client, such as pay for commissions, bonuses, profit sharing, severance, other compensation, vacation, fringe benefits, or other paid time off; (vi) failure of Client to timely advise PBS of an issue that could lead to or did in fact result in a claim or suit against PBS; (vii) Client taking action or failing to take action regarding a Co-Employee or work condition, including without limitation disciplinary actions such as performance reviews, suspensions, and terminations, that lead or contribute to a claim or suit against PBS.

**C.**  All indemnity obligations hereunder are without monetary limit and without regard to the cause thereof, including the negligence of either party, whether the negligence is sole, joint, comparative, or contributory. Except with respect to §25.B.(vi) and (vii), if such indemnification is for any reason not available or insufficient to hold the indemnitee harmless, the indemnitor agrees to contribute to the losses involved in such proportion as is appropriate to reflect the relative benefits received (or anticipated to be received) by each party with respect to the matters contemplated by this Agreement or, if such allocation is judicially determined to be unavailable, in such proportion as is appropriate to reflect the relative benefits and equitable considerations such as the relative fault of the parties. In the event of a breach of indemnity under §25.B. (vi) or (vii), Client agrees that PBS shall have the right to tender the defense of any claim or legal proceeding to Client, and that Client as of the date of such tender shall have the obligation to pay all expenses incurred in the defense of such claim or legal proceeding, including attorneys' fees, and such expenses and legal fees as are incurred. Notwithstanding any such tender, PBS shall retain the right to select its own counsel and direct the defense of any action or legal proceeding and to approve any settlement relating thereto.

**26.     LEGAL ADVICE:** Client agrees that no advice provided by PBS during the term of this Agreement shall be construed as legal advice or as substitute for legal advice. Client is encouraged to seek independent legal advice at its sole expense from licensed, qualified professionals of its choice. Client agrees that PBS does not provide legal advice and is not engaged in the practice of law or the provision of legal services, and that Client alone is completely and independently responsible for its own legal rights and obligations.

**27.     NOTICES:** Any notices under this Agreement shall be in writing and deemed given: (i) on the delivery date if delivered personally or by local commercial delivery service or if sent by facsimile transmission with printed verification of delivery; (ii) one business day after deposit with a commercial overnight carrier, with written verification of receipt; or (iii) five business days after mailing date whether or not actually accepted by addressee, if sent by U.S. mail, return receipt requested, postage and charges prepaid, or any other means of delivery for which a receipt is available.

**28.     WAIVER:** Failure by either party at any time to require performance by the other party or to claim a Breach of any provision of this Agreement will not be construed as a waiver of any subsequent Breach nor affect the effectiveness of this Agreement, nor any part thereof, nor prejudice either party in regard to any subsequent action.

**29.     ASSIGNMENT:** Client shall not assign or transfer its rights or obligations hereunder without the prior written consent of PBS. PBS reserves the right to transfer its rights, duties and obligations hereunder.

**30.     NO PARTNERSHIP OR AGENCY:** Nothing in this Agreement shall be deemed to create a partnership or joint venture between Client and PBS, and no fiduciary duty shall arise from the relationship created herein. In no event may either party act as the agent of the other party unless specifically authorized in writing to do so.

**31.     NO THIRD PARTY RIGHTS:** This Agreement is intended solely for the mutual benefit of the parties hereto and does not create any rights in a third party.

**32.   CONSTRUCTION:** PBS has prepared this Agreement and provided it to Client for Client's review. Client has either retained counsel or had the opportunity to do so to review this Agreement. With respect to any dispute concerning the meaning of this Agreement, this Agreement shall be interpreted as a whole with reference to its relevant provisions and in accordance with its fair meaning, and no part of this Agreement shall be construed against PBS on the basis that PBS drafted it. This Agreement shall be viewed as if prepared jointly by PBS and Client.

**33.   SEVERABILITY:** Should any term, condition, or provision of this Agreement be held to be unenforceable, the balance of this Agreement shall remain in force as if the unenforceable part did not exist. The captions in this Agreement are provided for convenience only and are not part of the terms and conditions of this Agreement.

**34.   HEADINGS:** The section and subsection headings have been included for convenience only, are not part of this Agreement, and shall not be construed as an interpretation of any provision of this Agreement.

**35.   AUTHORITY TO SIGN AGREEMENT:** Any officer or owner of Client signing this Agreement on behalf of Client represents, warrants, and guarantees that he or she has full authority to do so. Each party represents that it has the power and actual authority to enter into this Agreement and to be bound by the terms and conditions contained herein. The parties further represent that their signatures constitute a legal, valid, and binding obligation under this Agreement.

**36.   COUNTERPARTS:** This Agreement may be signed in one or more counterparts, each of which when executed shall be deemed an original and together shall constitute one and the same instrument.

**37.   INTEGRATION:** This Agreement, and any signed amendment, exhibit, or schedule attached hereto or incorporated herein constitute the entire agreement between the parties with regard to this subject matter and supersedes any and all agreements, whether oral or written, between the parties with respect to this subject matter. Client acknowledges that it has not been induced to enter into this Agreement by any representation or warranty not set forth in this Agreement, including but not limited to any statement made by any employee or marketing agent of PBS. Client acknowledges that PBS has made no representation that the Services will improve the performance of Client's business.

**38.   MODIFICATION:** Except as otherwise provided in this Agreement, PBS may amend the terms and conditions of this Agreement by giving Client 30 days' written notice. Any other modifications to this Agreement must be in writing and executed by authorized representatives of both parties to be enforceable.

**39.   CHOICE OF LAW:** This Agreement shall be governed by and construed in accordance with the laws of the State of Alabama, without regard to principles of conflicts of law. Client hereby irrevocably submits itself to the personal jurisdiction of the courts in and for Jefferson County, Alabama or in the United States District Court, Northern District of Alabama, Middle Division, and Client hereby waives, to the full extent permitted by law, any objection that it may now or hereafter have to the laying of venue of any such action in such court and any claim that any such action, suit or proceeding ("Action") has been brought in an inconvenient forum. The parties desire to have any Action filed by either of them to be tried before a judge or judicial panel without a jury, and therefore: (i) agree not to elect a trial by jury of any issue triable of right by jury, and (ii) waive any right to trial by jury fully to the extent that any such right shall now or hereafter exist. This waiver of right to trial by jury is separately given, knowingly and voluntarily, by each of the parties hereto, and this waiver is intended to encompass individually each instance and each issue as to which the right to a jury trial would otherwise accrue. Client hereby certifies that no representative or agent of PBS has represented, expressly or otherwise, that PBS will not seek to enforce this waiver of right to trial by jury.

**40.   ARBITRATION AND WAIVER OF JURY TRIAL.** PBS and Client agree that any controversy, dispute, or claim, whether individual, joint, or class in nature, arising from this Agreement or otherwise between them, including without limitation contract and tort disputes, shall be arbitrated in Birmingham, Alabama, or such other place as the parties may mutually agree in writing, under the Commercial Arbitration Rules or other applicable volume of rules of the American Arbitration Association. The award and any findings of the arbitrator(s) shall be rendered within 30 days of final arbitration hearing unless otherwise agreed upon by the parties. Judgment on any award rendered by the arbitrator(s) may be entered in any court having jurisdiction over such matter. The parties agree (i) to be bound by the findings, conclusions, and decision of the arbitrator(s), (ii) the statute of limitations, estoppel, waiver, laches, and similar doctrines which would otherwise be applicable in an action brought by a party in court shall be applicable in any arbitration proceeding, (iii) the commencement of an arbitration proceeding shall be deemed the commencement of an action for these purposes, and (iv) the provision of this Agreement relating to arbitration shall be construed in accordance with the Federal Arbitration Act (9 U.S.C. §§ 1, et seq.). In the event of a dispute, the prevailing party in any arbitration shall be entitled to recover from the other party its reasonable attorneys' fees and costs incurred, subject to the approval of the arbitrator(s). Consistent with this section, the parties WAIVE THEIR RIGHTS TO A JURY TRIAL of any dispute between them arising from this Agreement; however, nothing contained in this section will limit either party's ability to seek injunctive relief in any court. Nothing contained in this section shall limit PBS's right to file suit against Client (or to engage a collection agent to file suit against Client on PBS's behalf) to (i) collect a payment owed to PBS by Client under this Agreement or to otherwise demand payment from a Guarantor of Client, if any and (ii) seek damages in a court of law or equity, which arose as a result of Client's failure to obtain and provide insurance or to provide an indemnification as required under this Agreement, both of which may be brought in any court with competent jurisdiction.

**41.   ATTORNEY'S FEES:** If either party refers a matter to a collection agency or brings other action as a result of a Breach of this Agreement, the prevailing party in such collection proceeding or action shall be entitled to reimbursement for its reasonable attorney's fees and other costs and fees incurred in such collection or action in addition to any other relief to which the party may be entitled.

**42.   REMEDIES NOT EXCLUSIVE:** The rights and remedies provided herein shall not be exclusive and the parties shall have rights and remedies now or hereafter provided by law in addition to those provided for in this Agreement.  Institution of an action to effect collection of payment of an amount in default or the entry of a judgment in such action shall not be deemed to be an election by PBS nor shall it bar PBS from pursuing other remedies available to it at law or in equity.

**43.   STATE-SPECIFIC PROVISIONS AND SAVINGS:** This Agreement shall be further amended in accordance with Exhibit 1, hereto, which incorporates the state specific provisions applicable to the Services provided by PBS under this Agreement for any Co-Employees located in any state listed on Exhibit 1.  In the event that any term of Exhibit 1 conflicts with the terms of this Agreement, the term provided on Exhibit 1 shall control.  Likewise, in the event that during the term of this Agreement, any federal, state, or local law or ordinance shall further alter the obligations of the parties hereto, this Agreement shall be construed so as to comply with applicable law, giving maximum effect to the terms hereof.

**44.   DISCLAIMER OF WARRANTIES:**  EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, PBS EXPRESSLY DISCLAIMS ANY WARRANTY, EITHER EXPRESSED OR IMPLIED, INCLUDING WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, NON-INTERRUPTION OF USE, AND FREEDOM FROM PROGRAM ERRORS, VIRUSES, OR ANY OTHER MALICIOUS CODE WITH RESPECT TO PBS SERVICES, ANY CUSTOM PROGRAMS CREATED BY PBS OR ANY THIRD-PARTY SOFTWARE DELIVERED BY PBS.  PBS FURTHER DISCLAIMS ANY WARRANTY THAT THE RESULTS OBTAINED THROUGH THE USE OF PBS SERVICES, ANY CUSTOM PROGRAMS CREATED BY PBS, OR ANY THIRD-PARTY SOFTWARE DELIVERED BY PBS WILL MEET CLIENT'S NEEDS.

**45.   SURVIVABILITY:** Except where otherwise specified in this Agreement, the following sections of this Agreement shall survive the termination: §§ 19 through 45.

The signatures on behalf of PBS and Client immediately below constitute execution of this Agreement.

**PBS PEO SERVICES, LLC**

Signature: _____

Typed / Printed Name: _Tom J. Harcock_

Title: _VP of PEO Services_

Date: _9-30-2019_       _TH_

Effective Date: ~~August 1, 2019~~ _October 1, 2019_   _PBS_

**HOPE HOSPICE INC.**

Signature: _____

Typed / Printed Name: _Deb Stark_

Title: _CEO / RN_

Street Address: _651 Main Street   Suite 159_

City, State, Zip: _Gardendale AL 35071_

Date: ~~June 14, 2019~~  _8-30-2019_   current date

---

**GUARANTY:** Guarantor, whose signature appears below, acknowledges that Guarantor is a direct beneficiary of the above-signed client services agreement ("Client Service Agreement") between PBS and Client and understands that PBS would be unwilling to enter into or continue the Client Service Agreement without this Guaranty being signed, and guarantor is desirous of ensuring the fulfillment of all obligations of Client.  Accordingly:

**A.** Guarantor agrees that in the event Client has not fully complied with all of its obligations under the Client Service Agreement, including indemnification, Guarantor will upon demand by PBS pay to PBS all payments not made by Client and will perform all unfulfilled obligations of Client.

**B.** This Guaranty is an absolute and unconditional guarantee of payment and performance.  It shall be enforceable against Guarantor without the necessity of (a) any suit or proceedings on PBS's part against Client, its successors or assigns; (b) any notice of amendment; modification, supplementation; performance or nonperformance of or under the Client Service Agreement; or (c) any other notice or demand to which Guarantor might be entitled, all of which Guarantor hereby expressly waives.  Guarantor expressly agrees that the validity of this Guaranty and guarantor's obligations hereunder shall not be affected or diminished by any inaction of PBS under the Client Service Agreement; or by (i) the release or discharge of Client in any creditors' proceedings, receivership or bankruptcy; (ii) the limitations or modification of the liability of Client, or of any remedy for the enforcement of Client's liability under the Client Service Agreement resulting from the operation of any provision of Title 11, U.S.C., or any other statute or any court decision; (iii) any modification of the Client Service Agreement; or (iv) the rejection or disaffirmance of the Client Service Agreement in any proceedings.  Without limitation, the above sections of the Client Service Agreement are applicable and incorporated into this Guaranty:  §§ 27 through 45.   _8-30-2019_   current date

GUARANTOR: _____    _Deb Stark_        _06/14/19_
Signature                  Printed Name          Date

# Exhibit 1 to Client Service Agreement
# State Specific Amendments

To the extent Client employs Co-Employees in locations in any of the states listed below and any term or provision of the Client Service Agreement is in conflict with any term or provision of any amendment specified below, such term or provision shall be construed so as to give maximum effect to the term or provision of the Client Service Agreement necessary to remain compliant with such amendment specified below and limited only to such terms applicable to Co-Employees working for Client in the state indicated[1]:

**A.   Alabama:**  In Alabama PEO's are required to be registered and regulated by the Department of Industrial Relations under the Alabama Professional Employer Organization Act, and shall at all times be construed so as to give maximum effect to its terms in compliance with such Act.  All questions and/or complaints should be directed to the director of the PEO Division at 649 Monroe Street, Montgomery, AL 36131 or call (800) 528-5166.  All employees will be given notice in the New Hire Acknowledgement Package provided by PBS and all Clients must post the foregoing notice in each administrative office maintained within the state.  If Client has worksites in Alabama covered by this Agreement, Client understands that pursuant to the Alabama Professional Employer Organization Registration Act, SB41 §8. (e), "The controlling person of a client of a professional employer organization who fraudulently or falsely procures payroll checks without having adequate funds to compensate and reimburse the professional employer organization shall be guilty of a Class C felony".  By signing this Agreement, Client acknowledges Client has read and understands the foregoing sentence.

**B.   Arkansas:** This Agreement is executed between the parties subject to the provisions of the Arkansas Professional Employer Organization Recognition and Licensing Act, § 23-92-401 et seq., and shall at all times be construed so as to give maximum effect to its terms in compliance with such Act.

**C.   Connecticut:** This Agreement is executed between the parties subject to the provisions of the Connecticut Professional Employer Organization Act § 31-221 et seq., and shall at all times be construed so as to give maximum effect to its terms in compliance with such Act.

**D.   Florida:** This Agreement is executed between the parties subject to the provisions of the Florida Employee Leasing Act, § 468.520 et seq., and shall at all times be construed so as to give maximum effect to its terms in compliance with such Act. In §13.C the 2nd sentence is changed to read: Client will cause its workers' compensation carrier to issue a certificate of insurance which evidences coverage, names the Florida Board of Employee Leasing Companies, 1940 North Monroe Street, Tallahassee, Florida 32399-0767 as a certificate holder and allows not less than 30 days' notice of cancellation or material change. If Client has any worksites in Florida covered by this Agreement, Client affirms that pursuant to F.S. §627.192(8), except for premiums or amounts that are subject to good faith dispute, Client does not owe its current or prior insurers any past due premium for workers' compensation insurance, and does not owe its current or prior Professional Employer Organization ("PEO") any past due amounts under the service agreement with such PEO. Client has read the foregoing sentence and by signing below swears that the facts stated in the foregoing sentence are true.

**E.   Illinois:** This Agreement is executed between the parties subject to the provisions of the Illinois Employee Leasing Company Act, 215 ILCS § 113 et seq., and shall at all times be construed so as to give maximum effect to its terms in compliance with such Act.

**F.   Indiana:** This Agreement is executed between the parties subject to the provisions of the Indiana Professional Employer Organizations Act, Indiana Code § 27-16 et seq., and shall at all times be construed so as to give maximum effect to its terms in compliance with such Act.

**G.   Kansas:** This Agreement is executed between the parties subject to the provisions of the Kansas PEO Registration Act, Kan.Stat.Ann. § 44-1701 et seq., and shall at all times be construed so as to give maximum effect to its terms in compliance with such Act.

**H.   Kentucky:** This Agreement is executed between the parties subject to the provisions of the Kentucky Employee Leasing Act, KY.Rev.Stat.Ann. § 342 et seq., and shall at all times be construed so as to give maximum effect to its terms in compliance with such Act.

**I.   Louisiana:** This Agreement is executed between the parties subject to the provisions of the Louisiana Professional Employer Organizations Act, La.Rev.Stat.Ann. § 23:1761-1767, and shall at all times be construed so as to give maximum effect to its terms in compliance with such law.

**J.   Maine:** This Agreement is executed between the parties subject to the provisions of the Maine Employee Leasing Companies Act, Me.Rev.Stat.Ann.tit. 32 § 125-14051 et seq., and shall at all times be construed so as to give maximum effect to its terms in compliance with such Act.

**K.   Michigan:** This Agreement is executed between the parties subject to the provisions of the Michigan Professional Employer Organization Regulatory Act, § 338.3721 et seq., and shall at all times be construed so as to give maximum effect to its terms in compliance with such Act.  Furthermore, PBS and Client agree to comply with the Michigan worker's disability compensation act of 1969, 1969 PA 317, MCL 418.101 to 418.941.

**L.   Nebraska:** This Agreement is executed between the parties subject to the provisions of the Nebraska Professional Employer Organization Registration Act, Neb.Rev.Stat. § 48-2701 et seq., and shall at all times be construed so as to give maximum effect to its terms in compliance with such Act.

**M.   Nevada:** This Agreement is executed between the parties subject to the provisions of Nev.Rev.Stat. § 616B.670 et seq., and shall at all times be construed so as to give maximum effect to its terms in compliance with such Act.

**N.   New Jersey:** This Agreement is executed between the parties subject to the provisions of the New Jersey Employee Leasing Act, N.J.Stat.Ann. § 34-8-67 et seq., and shall at all times be construed so as to give maximum effect to its terms in compliance with such Act.

**O.   New Mexico:** This Agreement is executed between the parties subject to the provisions of the New Mexico Employee Leasing Act, N.M.Stat.Ann. § 60-13A-1 et seq., and shall at all times be construed so as to give maximum effect to its terms in compliance with such Act.

---

[1] The Client Service Agreement is applicable to Client's locations regardless of whether there are any unique state law amendments listed in this Exhibit 1. Exhibit 1 is not intended to be an exhaustive list of states and state laws, but rather to constitute amendment only for those states where such an amendment is required or appropriate under applicable law of that state.

**P.  New York:** This Agreement is executed between the parties subject to the provisions of the New York Professional Employer Act, N.Y. Labor Law § 31-915 et seq., and shall at all times be construed so as to give maximum effect to its terms in compliance with such Act.

**Q.  North Carolina:** This Agreement is executed between the parties subject to the following provisions of the North Carolina Professional Employer Organizations Act, N.C.Gen.Stat. § 58-89A-1 et seq., and shall at all times be construed so as to give maximum effect to its terms in compliance with such Act.  PBS and the Client assume the responsibilities required by this Act.

**R.  North Dakota:** This Agreement is executed between the parties subject to the following provisions of the North Dakota Professional Employer Organizations Act, N.D. Cent. Code § 43-55-01 et seq., and shall at all times be construed so as to give maximum effect to its terms in compliance with such Act.  PBS and the Client assume the responsibilities required by this Act.

**S.  Ohio:** This Agreement is executed between the parties subject to the provisions of the Ohio Professional Employer Organizations Act, Ohio Rev. Code Ann. § 4125.01 et seq., and shall at all times be construed so as to give maximum effect to its terms in compliance with such Act.

**T.  Pennsylvania:** This Agreement is executed between the parties subject to the following provisions of the Pennsylvania Professional Employer Organization Act, PL 946, No 102, and shall at all times be construed so as to give maximum effect to its terms in compliance with such Act. PBS and the Client assume the responsibilities required by this Act.

**U.  South Carolina:** This Agreement is executed between the parties subject to the following provisions of the South Carolina Regulation of Professional Employer Organizations, S.C. Code Ann. § 40-68-10 et seq., and shall at all times be construed so as to give maximum effect to its terms in compliance with such Act.  Client shall post in each of its South Carolina locations in a conspicuous place that is in clear and unobstructed view of Co-employees a notice that states as follows: "We are operating under and subject to the Workers' Compensation Act of South Carolina. In case of accidental injury or death to an employee, the injured employee, or someone acting on his or her behalf, shall notify immediately (PBS, address, and telephone) or [Insert Client's name, address, and telephone number]. Failure to give immediate notice may be the cause of serious delay in the payment of compensation to you or your beneficiaries and may result in failure to receive any compensation benefits."

**V.  Tennessee:** This Agreement is executed between the parties subject to the following provisions of Tennessee's Professional Employer Act, Tenn. Code Ann. § 62-43-101 et seq., and shall at all times be construed so as to give maximum effect to its terms in compliance with such Act.  PBS and the Client assume the responsibilities required by this Act.

**W.  Texas:** This Agreement is executed between the parties subject to the provisions of the Texas Professional Employer Organization Act, Texas (Labor) Code Ann. § 91.001 et seq., and shall at all times be construed so as to give maximum effect to its terms in compliance with such Act. Without limiting Client's obligation under §8.B. to comply with other laws and regulations, Client agrees to comply with the Texas Payday Law (including but not limited to the payment of pay for vacations, holidays, sick leave, parental leave, severance, bonuses or commissions owed to an employee under the terms of an agreement between the employee and Client or under a policy of Client).  The following sentences shall be added to §13.A: Client agrees that if an independent contractor does not provide evidence of workers' compensation coverage, Client will require the independent contractor to enter an agreement assuming responsibility as an independent contractor in accordance with the Texas Labor Code.  Add the following sentences to §39: PBS IS SUBJECT TO REGULATION BY THE TEXAS DEPARTMENT OF LICENSING AND REGULATION ("DLR"), ANY UNRESOLVED COMPLAINTS CONCERNING A LICENSEE OR QUESTIONS CONCERNING THE REGULATION OF STAFF LEASING SERVICES MAY BE ADDRESSED TO THE DLR AT P.O. BOX 12157, AUSTIN, TX 78711 OR CLIENT MAY CALL THE DLR AT (512) 463-5522.

**X.  Utah:** This Agreement is executed between the parties subject to the provisions of the Utah PEO Licensing Act Utah Code Ann. § 31A-40-101 et seq., and shall at all times be construed so as to give maximum effect to its terms in compliance with such Act.

**Y.  Virginia:** This Agreement is executed between the parties subject to the provisions of Va. Code Ann. § 65.2-803.1 et seq., and shall at all times be construed so as to give maximum effect to its terms in compliance with such law.

**Z.  Wisconsin:** This Agreement is executed between the parties subject to the provisions of Wis.Stat. §§ 108.02, 108.067, and 202.01 et seq., and shall at all times be construed so as to give maximum effect to its terms in compliance with such law.

# Schedule A, Part A

**The following shall be used in calculating the Fees to be charged per pay period for Services rendered under the Client Service Agreement.**

### Statutory Payroll Taxes

**Federal Insurance Contribution Act (FICA):**
6.2% OASDI on wages subject to the wage base adjusted annually and Medicare of 1.45% of gross wages.


**Federal Unemployment Tax Act (FUTA):**
.6% of wages paid to each employee subject to the wage base as established by federal law.


**State Unemployment Tax Act (SUTA):**
Client's Rate(s) are applied to the wage base as established by state law.
2019 Alabama Rate = 2.70%

**Once an employee exceeds the annual wage base for the taxes listed above, that portion of the client's rate will be reduced accordingly**

### Workers' Compensation

If workers' compensation insurance is secured through PBS, PBS will administer Client's required workers' compensation insurance. Pursuant to 13.B. of the Client Service Agreement, PBS will add actual costs for such coverage, on a per pay period basis, to each invoice.

### Service Fees

A. New Client Set-up Fee: **$ 250.00**

B. Service Fee: **$ 41.67** per employee per pay period for the Services provided by PBS in 3.A. and any other services(s) as may be agreed upon in writing below.

C. Client Payday will be on **15th & Last Day of the Month** on a **Semi-Monthly** basis.

D. Time must be received at least 72 hours prior to your payday to insure the processing and timely distribution of payroll. (Direct Dep, etc.)

E. Employer paid medical, dental or similar employee benefit plans will be billed separately (if applicable).

F. Annual 401(k) Plan Fee: **$ 650.00** (if applicable)

Initial: 

**The selected "x" Services listed below are included in the Service Fee unless otherwise noted (**)**

### PRIMARY BENEFIT PROGRAMS

- Employee Change Fees
- Departmental/Management Reports
- Court Ordered Garnishments
- Delivery Fee – Courier **

- Federal Wire Fee **
- USPS to Individual Addresses **
- 401(k) Participation
- "Section 125" Participation

### HUMAN RESOURCES ADMINISTRATION

- Payroll Processing
- Wage Administration
- Withholding
- New Hire Reporting
- Employee Handbook

- W-2 Processing
- Tip Processing
- Direct Deposit

- Job Cost Tracking
- Voluntary Deductions
- I-9 Compliance-New Hires
- Garnishments

### EMPLOYEE BENEFITS ADMINISTRATION

- Medical Insurance
- Dental Insurance
- Vision Insurance
- Life Insurance

- Accident Insurance
- Critical Illness Insurance
- Short Term Disability
- Long Term Disability

- Medical Transport Solutions
- Lifelock Identity Theft Protection

### UNEMPLOYMENT & WORKERS' COMPENSATION ADMINISTRATION

- Claims Verification
- Claims Management
- Bureau Coordination

- First Report of Injury Assistance
- Appeal Actions

** Billed to Client at additional cost.

Client: __Hope Hospice Inc.__

By: _____

Title: _CEO /RN_____

Date: _June 14, 2019_____

# Schedule A, Part B - Schedule of Benefits

The following Benefits are provided by **PBS** and administered by **PBS.**

Retirement Plan:

| **Plan Provider** | **Effective Date** |
|---|---|
| John Hancock Financial | _TBD_ - If applicable |

Benefit Plans:

| **Benefit Plan** | **Effective Date** |
|---|---|
| BC/BS Group Medical Coverage | _06/01/2019_ |
| Alliance Secondary Coverage | _06/01/2019_ |
| MetLife Group Dental Coverage | _06/01/2019_ |
| MetLife Group Vision Coverage | _06/01/2019_ |
| Section 125 "POP" Plan | _06/01/2019_ |
| MetLife Voluntary Term Life Insurance | _06/01/2019_ |
| MetLife STD and LTD – Employer Paid | _06/01/2019_ (With ER Request Only) |
| Aflac Accident, Cancer, Critical Illness, STD and Life | _06/01/2019_ |

Client: _Hope Hospice Inc._          By: _____

Date: _June 14, 2019_          Title: _CEO / RN_

Revised 10/12/2018

<u>Schedule A, Part C - PBS PEO Services LLC ("Processor")</u>

## ACH AUTHORIZATION AGREEMENT

Client Name:     Hope Hospice Inc.

Address:     651 Main Street, Suite 159, Gardendale, AL 35071

FEIN:     76-0704000          Client Number: 

Date: 

*Client hereby authorizes Processor to initiate debits to cover obligations incurred for Client's payroll, payroll tax filings and invoice obligations by use of the Automated Clearing House ("ACH"), an electronic payment network. Client further authorizes Processor to initiate any credit or debit entry which, in the sole discretion of the Processor, is required to correct processing errors, including without limitation, the reversal of credits if Client's payroll account is not fully funded when Processor issues payroll credits to Client's payroll participants. This authorization applies to the following depository accounts:*

| Authorization Agreement for Payroll ACH Debits/Credits: | Yes ☒ No ☐ |
|---|---|
| Depository Name: Pinnacle Bank | |
| City Birmingham     State AL | Zip 35235 |
| ☒ Checking   ☐ Savings (Indicate type of account) | |
| Transit/ABA Number 262287386 | Account Number 1760134376 |

| Authorization Agreement for Tax Filing Debit/Credits: | Yes ☐ No ☐ Same as payroll ACH ☐ |
|---|---|
| Depository Name: | |
| City     State | Zip |
| ☐ Checking   ☐ Savings (Indicate type of account) | |
| Transit/ABA Number | Account Number |

| Authorization Agreement for Invoice Debit/Credits: | Yes ☐ No ☐ Same as payroll ACH ☒ |
|---|---|
| Depository Name: | |
| City     State | Zip |
| ☐ Checking   ☐ Savings (Indicate type of account) | |
| Transit/ABA Number | Account Number |

*Client acknowledges that Processor will originate the ACH transactions and will follow the rules for ACH originators adopted by the National Automated Clearing House Association ("NACHA"). Client agrees to obtain, maintain and provide all necessary authorizations from its employees for ACH transfers involving employees including the authorizations to make adjusting entries and credit reversals, as may be required. It is the sole and exclusive responsibility of the Client to ensure their bank account is timely and fully funded to cover the total payroll expense for each pay date – Processor does not agree to act as Client's bank or financing entity. Client agrees to hold harmless, defend and indemnify Processor of and from any claims made or filed against Processor by Client's payroll participant(s) arising out of or otherwise related to the Processor reversing payroll credits issued to said participants upon the discovery that Client failed to timely and fully fund its payroll account when Processor issued said credits. Any fees, losses and/or other damages related in any way to insufficient funds of Client and/or its payroll participants (due to Processor reversing their payroll credits due to Client's failure to first fully fund its payroll account) are the Client's sole and exclusive responsibility.*

*This authority is to remain in full force and effect until Processor is notified by Client in writing of termination or revocation. Client and payee authorizations shall comply with National Automated Clearing House Association ("NACHA") rules and procedures. Client agrees that Shelby County, Alabama shall be the proper venue for any dispute which arises out of this business relationship and that Processor shall be reimbursed any and all legal fees and court costs incurred to protect its rights herein.*

Client Name:     Hope Hospice, Inc.

By:

Please Print:

Deb Stark, CEO

Name and Title of Authorized Officer of Client

Agreed to and Signed by Processor

# EXHIBIT B

# Internal Revenue Service
### United States Department of the Treasury

This Product Contains Sensitive Taxpayer Data

Request Date: 05-31-2022
Response Date: 05-31-2022
Tracking Number: 102135358291

## Account Transcript

FORM NUMBER: 941                                    TAX PERIOD: Mar. 31, 2020

TAXPAYER IDENTIFICATION NUMBER: XX-XXX4000

HOP HOSP IN
% DEBO SHA
651 MA

--- ANY MINUS SIGN SHOWN BELOW SIGNIFIES A CREDIT AMOUNT ---

ACCOUNT BALANCE:            $0.00
ACCRUED INTEREST:           $0.00                   AS OF: Jun. 06, 2022
ACCRUED PENALTY:            $0.00                   AS OF: Apr. 30, 2020

ACCOUNT BALANCE
  PLUS ACCRUALS
  (THIS IS NOT A
  PAYOFF AMOUNT):           $0.00

** INFORMATION FROM THE RETURN OR AS ADJUSTED **

TAX PER TAXPAYER:        $104,296.08

RETURN DUE DATE OR RETURN RECEIVED DATE (WHICHEVER IS LATER)  Mar. 03, 2021
PROCESSED DATE                                               Aug. 16, 2021

TRANSACTIONS

| CODE | EXPLANATION OF TRANSACTION | CYCLE | DATE | AMOUNT |
|------|----------------------------|-------|------|--------|
| 150 | Tax return filed 29141-124-02563-1 | 202130 | 08-16-2021 | $104,296.08 |
| 599 | Tax return secured | | 06-07-2021 | $0.00 |
| 166 | Penalty for filing tax return after the due date 08-16-2031 | 202130 | 08-16-2021 | $23,466.62 |
| 276 | Penalty for late payment of tax | | 08-16-2021 | $8,343.69 |
| 196 | Interest charged for late payment | 202130 | 08-16-2021 | $5,500.70 |
| 971 | Account match for federal levy payment program | | 10-25-2021 | $0.00 |
| 971 | Collection due process Notice of Intent to Levy -- issued | | 10-25-2021 | $0.00 |
| 971 | Collection due process Notice of Intent to Levy -- return receipt signed | | 10-28-2021 | $0.00 |
| 960 | Appointed representative | | 12-14-2021 | $0.00 |
| 971 | First Levy Issued on Module | | 01-10-2022 | $0.00 |
| 971 | Account match for federal levy payment program | | 01-31-2022 | $0.00 |

Tracking Number: 102135358291

| 670 | Payment | | 01-12-2022 | -$104,475.22 |
|---|---|---|---|---|
| 706 | Credit transferred in from 940 201712 | | 02-07-2022 | -$2,825.93 |
| 706 | Credit transferred in from 940 201712 | | 01-12-2022 | -$36,056.76 |
| 706 | Credit transferred in from 940 201712 | | 02-14-2022 | -$4,693.32 |
| 276 | Penalty for late payment of tax | | 02-14-2022 | $4,693.32 |
| 196 | Interest charged for late payment | 202204 | 02-14-2022 | $1,750.82 |
| 670 | Payment | | 01-19-2022 | -$8,110.37 |
| 197 | Reduced or removed interest charged for late payment | | 02-21-2022 | -$4.41 |
| 776 | Interest credited to your account | | 02-21-2022 | -$1.56 |
| 846 | Refund issued | | 02-21-2022 | $8,116.34 |
| 976 | Amended return filed 29141-043-80601-2 | | 02-05-2022 | $0.00 |

This Product Contains Sensitive Taxpayer Data



# Internal Revenue Service
### United States Department of the Treasury

This Product Contains Sensitive Taxpayer Data

Request Date: 05-31-2022
Response Date: 05-31-2022
Tracking Number: 102135358291

Account Transcript

FORM NUMBER: 941                                      TAX PERIOD: Jun. 30, 2020

TAXPAYER IDENTIFICATION NUMBER: XX-XXX4000

HOP HOSP IN
% DEBO SHA
651 MA

--- ANY MINUS SIGN SHOWN BELOW SIGNIFIES A CREDIT AMOUNT ---

ACCOUNT BALANCE:                 $0.00
ACCRUED INTEREST:                $0.00               AS OF: Jun. 06, 2022
ACCRUED PENALTY:                 $0.00               AS OF: Jul. 31, 2020

ACCOUNT BALANCE
  PLUS ACCRUALS
  (THIS IS NOT A
  PAYOFF AMOUNT):                $0.00

** INFORMATION FROM THE RETURN OR AS ADJUSTED **

TAX PER TAXPAYER:               $0.00

RETURN DUE DATE OR RETURN RECEIVED DATE (WHICHEVER IS LATER)  Feb. 05, 2022
PROCESSED DATE                                               Mar. 07, 2022

TRANSACTIONS
CODE  EXPLANATION OF TRANSACTION          CYCLE   DATE         AMOUNT
150   Tax return filed                    202207  03-07-2022        $0.00
      29141-043-80602-2

960   Appointed representative                    12-14-2021        $0.00

This Product Contains Sensitive Taxpayer Data

This page is left blank intentionally.



# Internal Revenue Service
## United States Department of the Treasury

This Product Contains Sensitive Taxpayer Data

Request Date: 05-31-2022
Response Date: 05-31-2022
Tracking Number: 102135358291

## Account Transcript

FORM NUMBER: 941                                TAX PERIOD: Sep. 30, 2020

TAXPAYER IDENTIFICATION NUMBER: XX-XXX4000

HOP HOSP IN
% DEBO SHA
651 MA

--- ANY MINUS SIGN SHOWN BELOW SIGNIFIES A CREDIT AMOUNT ---

```
ACCOUNT BALANCE:            $0.00
ACCRUED INTEREST:           $0.00              AS OF: Jun. 06, 2022
ACCRUED PENALTY:            $0.00              AS OF: Oct. 31, 2020

ACCOUNT BALANCE
  PLUS ACCRUALS
  (THIS IS NOT A
  PAYOFF AMOUNT):          $0.00
```

** INFORMATION FROM THE RETURN OR AS ADJUSTED **

TAX PER TAXPAYER:          $0.00

RETURN DUE DATE OR RETURN RECEIVED DATE (WHICHEVER IS LATER)  Feb. 05, 2022
PROCESSED DATE                                                Mar. 07, 2022

TRANSACTIONS

| CODE | EXPLANATION OF TRANSACTION | CYCLE | DATE | AMOUNT |
|------|---------------------------|-------|------|--------|
| 150 | Tax return filed<br>29141-043-80603-2 | 202207 | 03-07-2022 | $0.00 |
| 960 | Appointed representative | | 12-14-2021 | $0.00 |

This Product Contains Sensitive Taxpayer Data

This page is left blank intentionally.

# Internal Revenue Service
## United States Department of the Treasury

This Product Contains Sensitive Taxpayer Data

Request Date: 05-31-2022
Response Date: 05-31-2022
Tracking Number: 102135358291

Account Transcript

FORM NUMBER: 941                                TAX PERIOD: Dec. 31, 2020

TAXPAYER IDENTIFICATION NUMBER: XX-XXX4000

HOP HOSP IN
% DEBO SHA
651 MA

--- ANY MINUS SIGN SHOWN BELOW SIGNIFIES A CREDIT AMOUNT ---

ACCOUNT BALANCE:              $0.00
ACCRUED INTEREST:             $0.00                AS OF: Jun. 06, 2022
ACCRUED PENALTY:              $0.00                AS OF: Jan. 31, 2021

ACCOUNT BALANCE
  PLUS ACCRUALS
  (THIS IS NOT A
  PAYOFF AMOUNT):             $0.00

** INFORMATION FROM THE RETURN OR AS ADJUSTED **

TAX PER TAXPAYER:             $0.00

RETURN DUE DATE OR RETURN RECEIVED DATE (WHICHEVER IS LATER)   Feb. 05, 2022
PROCESSED DATE                                                 Mar. 07, 2022

TRANSACTIONS
CODE EXPLANATION OF TRANSACTION          CYCLE   DATE         AMOUNT
150  Tax return filed                    202207  03-07-2022        $0.00
     29141-043-80604-2

960  Appointed representative                    12-14-2021        $0.00

This Product Contains Sensitive Taxpayer Data

This page is left blank intentionally.

# EXHIBIT C

Form **941-X:**
(Rev. April 2022)

**Adjusted Employer's QUARTERLY Federal Tax Return or Claim for Refund**
Department of the Treasury — Internal Revenue Service

OMB No. 1545-0029

**Employer identification number (EIN)**  7 6 – 0 7 0 4 0 0 0

**Name** (not your trade name)  Hope Hospice Inc.

**Trade name** (if any)

**Address**  651 Main Street Suite 159
Number    Street                                          Suite or room number

Gardendale                              AL      35071
City                                    State    ZIP code

Foreign country name    Foreign province/county    Foreign postal code

**Return You're Correcting...**

Check the type of return you're correcting.

[X] 941

[ ] 941-SS

Check the ONE quarter you're correcting.

[X] **1:** January, February, March

[ ] **2:** April, May, June

[ ] **3:** July, August, September

[ ] **4:** October, November, December

Enter the calendar year of the quarter you're correcting.

2020  (YYYY)

Enter the date you discovered errors.

6 / 9 / 2022
(MM / DD / YYYY)

Read the separate instructions before completing this form. Use this form to correct errors you made on Form 941 or 941-SS. Use a separate Form 941-X for each quarter that needs correction. Type or print within the boxes. You MUST complete all five pages. Don't attach this form to Form 941 or 941-SS unless you're reclassifying workers; see the instructions for line 42.

**Part 1:** Select ONLY one process. See page 6 for additional guidance, including information on how to treat employment tax credits and social security tax deferrals.

[ ] **1.** **Adjusted employment tax return.** Check this box if you underreported tax amounts. Also check this box if you overreported tax amounts and you would like to use the adjustment process to correct the errors. You must check this box if you're correcting both underreported and overreported tax amounts on this form. The amount shown on line 27, if less than zero, may only be applied as a credit to your Form 941, Form 941-SS, or Form 944 for the tax period in which you're filing this form.

[X] **2.** **Claim.** Check this box if you overreported tax amounts only and you would like to use the claim process to ask for a refund or abatement of the amount shown on line 27. Don't check this box if you're correcting ANY underreported tax amounts on this form.

**Part 2:** Complete the certifications.

[X] **3.** **I certify that I've filed or will file Forms W-2, Wage and Tax Statement, or Forms W-2c, Corrected Wage and Tax Statement, as required.**

**Note:** If you're correcting underreported tax amounts only, go to Part 3 on page 2 and skip lines 4 and 5. If you're correcting overreported tax amounts, for purposes of the certifications on lines 4 and 5, Medicare tax doesn't include Additional Medicare Tax. Form 941-X can't be used to correct overreported amounts of Additional Medicare Tax unless the amounts weren't withheld from employee wages or an adjustment is being made for the current year.

**4.** **If you checked line 1 because you're adjusting overreported federal income tax, social security tax, Medicare tax, or Additional Medicare Tax, check all that apply.** You must check at least one box.
I certify that:

[ ] **a.** I repaid or reimbursed each affected employee for the overcollected federal income tax or Additional Medicare Tax for the current year and the overcollected social security tax and Medicare tax for current and prior years. For adjustments of employee social security tax and Medicare tax overcollected in prior years, I have a written statement from each affected employee stating that he or she hasn't claimed (or the claim was rejected) and won't claim a credit or refund for the overcollection.

[ ] **b.** The adjustments of social security tax and Medicare tax are for the employer's share only. I couldn't find the affected employees or each affected employee didn't give me a written statement that he or she hasn't claimed (or the claim was rejected) and won't claim a refund or credit for the overcollection.

[ ] **c.** The adjustment is for federal income tax, social security tax, Medicare tax, or Additional Medicare Tax that I didn't withhold from employee wages.

**5.** **If you checked line 2 because you're claiming a refund or abatement of overreported federal income tax, social security tax, Medicare tax, or Additional Medicare Tax, check all that apply.** You must check at least one box.
I certify that:

[ ] **a.** I repaid or reimbursed each affected employee for the overcollected social security tax and Medicare tax. For claims of employee social security tax and Medicare tax overcollected in prior years, I have a written statement from each affected employee stating that he or she hasn't claimed (or the claim was rejected) and won't claim a refund or credit for the overcollection.

[ ] **b.** I have a written consent from each affected employee stating that I may file this claim for the employee's share of social security tax and Medicare tax. For refunds of employee social security tax and Medicare tax overcollected in prior years, I also have a written statement from each affected employee stating that he or she hasn't claimed (or the claim was rejected) and won't claim a refund or credit for the overcollection.

[ ] **c.** The claim for social security tax and Medicare tax is for the employer's share only. I couldn't find the affected employees, or each affected employee didn't give me a written consent to file a claim for the employee's share of social security tax and Medicare tax, or each affected employee didn't give me a written statement that he or she hasn't claimed (or the claim was rejected) and won't claim a refund or credit for the overcollection.

[X] **d.** The claim is for federal income tax, social security tax, Medicare tax, or Additional Medicare Tax that I didn't withhold from employee wages.

**For Paperwork Reduction Act Notice, see the separate instructions.**    www.irs.gov/Form941X    Cat. No. 17025J    Form **941-X** (Rev. 4-2022)

| Name *(not your trade name)* | Employer identification number (EIN) | Correcting quarter | (1, 2, 3, 4) |
|---|---|---|---|
| | | Correcting calendar year (YYYY) | |
| Hope Hospice Inc. | 76 – 0704000 | 2020 | |

**Part 3:** Enter the corrections for this quarter. If any line doesn't apply, leave it blank.

| | | *Column 1*<br>Total corrected amount (for ALL employees) | | *Column 2*<br>Amount originally reported or as previously corrected (for ALL employees) | = | *Column 3*<br>Difference (If this amount is a negative number, use a minus sign.) | *Column 4*<br>Tax correction |
|---|---|---|---|---|---|---|---|
| 6. | **Wages, tips, and other compensation** (Form 941, line 2) | 0 . 00 | – | 295456 . 34 | = | -295456 . 34 | Use the amount in Column 1 when you prepare your Forms W-2 or Forms W-2c. |
| 7. | **Federal income tax withheld from wages, tips, and other compensation** (Form 941, line 3) | 0 . 00 | – | 67659 . 49 | = | 67659 . 49 | Copy Column 3 here . . 67659 . 49 |
| 8. | **Taxable social security wages** (Form 941 or 941-SS, line 5a, Column 1) | 0 . 00 | – | 295456 . 34 | = | -295456 . 34 | × 0.124* = 36636 . 59 |
| | | | | | | | * If you're correcting your employer share only, use 0.062. See instructions. |
| 9. | **Qualified sick leave wages*** (Form 941 or 941-SS, line 5a(i), Column 1) | . | – | . | = | . | × 0.062 = . |
| | | | | | | * Use line 9 only for qualified sick leave wages paid after March 31, 2020, for leave taken before April 1, 2021. | |
| 10. | **Qualified family leave wages*** (Form 941 or 941-SS, line 5a(ii), Column 1) | . | – | . | = | . | × 0.062 = . |
| | | | | | | * Use line 10 only for qualified family leave wages paid after March 31, 2020, for leave taken before April 1, 2021. | |
| 11. | **Taxable social security tips** (Form 941 or 941-SS, line 5b, Column 1) | . | – | . | = | . | × 0.124* = . |
| | | | | | | | * If you're correcting your employer share only, use 0.062. See instructions. |
| 12. | **Taxable Medicare wages & tips** (Form 941 or 941-SS, line 5c, Column 1) | . | – | . | = | . | × 0.029* = . |
| | | | | | | | * If you're correcting your employer share only, use 0.0145. See instructions. |
| 13. | **Taxable wages & tips subject to Additional Medicare Tax withholding** (Form 941 or 941-SS, line 5d) | . | – | . | = | . | × 0.009* = . |
| | | | | | | | * Certain wages and tips reported in Column 3 shouldn't be multiplied by 0.009. See instructions. |
| 14. | **Section 3121(q) Notice and Demand—Tax due on unreported tips** (Form 941 or 941-SS, line 5f) | | | . | = | . | Copy Column 3 here . |
| 15. | **Tax adjustments** (Form 941 or 941-SS, lines 7 through 9) | | | . | = | . | Copy Column 3 here . . |
| 16. | **Qualified small business payroll tax credit for increasing research activities** (Form 941 or 941-SS, line 11a; you must attach Form 8974) | | | . | = | . | See Instructions |
| 17. | **Nonrefundable portion of credit for qualified sick and family leave wages for leave taken before April 1, 2021** (Form 941 or 941-SS, line 11b) | | | . | = | . | See instructions |
| 18a. | **Nonrefundable portion of employee retention credit*** (Form 941 or 941-SS, line 11c) | | | . | = | . | See Instructions |
| | | | | | | * Use line 18a only for corrections to quarters beginning after March 31, 2020, and before January 1, 2022. | |
| 18b. | **Nonrefundable portion of credit for qualified sick and family leave wages for leave taken after March 31, 2021, and before October 1, 2021** (Form 941 or 941-SS, line 11d) | . | – | . | = | . | See Instructions |
| 18c. | **Nonrefundable portion of COBRA premium assistance credit** (Form 941 or 941-SS, line 11e) | . | – | . | = | . | See instructions |
| 18d. | **Number of individuals provided COBRA premium assistance** (Form 941 or 941-SS, line 11f) | . | – | . | = | . | |
| 19. | **Special addition to wages for federal income tax** | . | – | . | = | . | See instructions |
| 20. | **Special addition to wages for social security taxes** | . | – | . | = | . | See instructions |
| 21. | **Special addition to wages for Medicare taxes** | . | – | . | = | . | See instructions |

Form **941-X** (Rev. 4-2022)

| Name (not your trade name) | Employer identification number (EIN) | Correcting quarter | (1, 2, 3, 4) |
|---|---|---|---|
| | | Correcting calendar year (YYYY) | |
| Hope Hospice Inc. | 76 – 0704000 | 2020 | |

**Part 3:** Enter the corrections for this quarter. If any line doesn't apply, leave it blank. *(continued)*

| | | Column 1 Total corrected amount (for ALL employees) | | Column 2 Amount originally reported or as previously corrected (for ALL employees) | = | Column 3 Difference (If this amount is a negative number, use a minus sign.) | | Column 4 Tax correction |
|---|---|---|---|---|---|---|---|---|
| 22. | Special addition to wages for Additional Medicare Tax | | – | | = | | See instructions | |
| 23. | Combine the amounts on lines 7 through 22 of Column 4 | | | | | | | 104296 . 08 |
| 24. | Deferred amount of social security tax* (Form 941 or 941-SS, line 13b) | | – | | = | | See instructions | |
| | *Use this line to correct the employer deferral for the second quarter of 2020 and the employer and employee deferral for the third and fourth quarters of 2020. | | | | | | | |
| 25. | Refundable portion of credit for qualified sick and family leave wages for leave taken before April 1, 2021 (Form 941 or 941-SS, line 13c) | | – | | = | | See instructions | |
| 26a. | Refundable portion of employee retention credit* (Form 941 or 941-SS, line 13d) | | – | | = | | See instructions | |
| | *Use line 26a only for corrections to quarters beginning after March 31, 2020, and before January 1, 2022. | | | | | | | |
| 26b. | Refundable portion of credit for qualified sick and family leave wages for leave taken after March 31, 2021, and before October 1, 2021 (Form 941 or 941-SS, line 13e) | | – | | = | | See instructions | |
| 26c. | Refundable portion of COBRA premium assistance credit (Form 941 or 941-SS, line 13f) | | – | | = | | See instructions | |
| 27. | **Total.** Combine the amounts on lines 23 through 26c of Column 4 | | | | | | | 104296 . 08 |

**If line 27 is less than zero:**

- If you checked line 1, this is the amount you want applied as a credit to your Form 941 or 941-SS for the tax period in which you're filing this form. (If you're currently filing a Form 944, Employer's ANNUAL Federal Tax Return, see the instructions.)
- If you checked line 2, this is the amount you want refunded or abated.

**If line 27 is more than zero, this is the amount you owe.** Pay this amount by the time you file this return. For information on how to pay, see *Amount you owe* in the instructions.

| | | Column 1 | | Column 2 | | Column 3 | | |
|---|---|---|---|---|---|---|---|---|
| 28. | Qualified health plan expenses allocable to qualified sick leave wages for leave taken before April 1, 2021 (Form 941 or 941-SS, line 19) | | – | | = | | | |
| 29. | Qualified health plan expenses allocable to qualified family leave wages for leave taken before April 1, 2021 (Form 941 or 941-SS, line 20) | | – | | = | | | |
| 30. | Qualified wages for the employee retention credit* (Form 941 or 941-SS, line 21) | | – | | = | | | |
| | *Use line 30 only for corrections to quarters beginning after March 31, 2020, and before January 1, 2022. | | | | | | | |
| 31a. | Qualified health plan expenses for the employee retention credit* (Form 941 or 941-SS, line 22) | | – | | = | | | |
| | *Use line 31a only for corrections to quarters beginning after March 31, 2020, and before January 1, 2022. | | | | | | | |
| 31b. | Check here if you're eligible for the employee retention credit in the third or fourth quarter of 2021 solely because your business is a recovery startup business . . . . . . . . . . . . | | | | | | | ☐ |
| 32. | Credit from Form 5884-C, line 11, for this quarter* (Form 941 or 941-SS, line 23) | | – | | = | | | |
| | *Use line 32 only for corrections to quarters beginning after March 31, 2020, and before April 1, 2021. | | | | | | | |

Form **941-X** (Rev. 4-2022)

| Name *(not your trade name)* | Employer identification number (EIN) | Correcting quarter    (1, 2, 3, 4) |
|---|---|---|
| | | Correcting calendar year  (YYYY) |
| Hope Hospice Inc. | 76 – 0704000 | 2020 |

**Part 3:** Enter the corrections for this quarter. If any line doesn't apply, leave it blank. *(continued)*

| | | Column 1 | Column 2 | Column 3 |
|---|---|---|---|---|
| | | *Total corrected amount (for ALL employees)* | *Amount originally reported or as previously corrected (for ALL employees)* = | *Difference (If this amount is a negative number, use a minus sign.)* |

**33a.** Qualified wages paid March 13 through March 31, 2020, for the employee retention credit* (Form 941 or 941-SS, line 24)

[ . ] − [ . ] = [ . ]

\* Use line 33a only for corrections to the second quarter of 2020.

**33b.** Deferred amount of the employee share of social security tax included on Form 941 or 941-SS, line 13b* (Form 941 or 941-SS, line 24)

[ . ] − [ . ] = [ . ]

\* Use line 33b only for corrections to the third and fourth quarters of 2020.

**34.** Qualified health plan expenses allocable to wages reported on Form 941 or 941-SS, line 24* (Form 941 or 941-SS, line 25)

[ . ] − [ . ] = [ . ]

\* Use line 34 only for corrections to the second quarter of 2020.

**Caution:** Lines 35–40 apply only to quarters beginning after March 31, 2021.

**35.** Qualified sick leave wages for leave taken after March 31, 2021, and before October 1, 2021 (Form 941 or 941-SS, line 23)

[ . ] − [ . ] = [ . ]

**36.** Qualified health plan expenses allocable to qualified sick leave wages for leave taken after March 31, 2021, and before October 1, 2021 (Form 941 or 941-SS, line 24)

[ . ] − [ . ] = [ . ]

**37.** Amounts under certain collectively bargained agreements allocable to qualified sick leave wages for leave taken after March 31, 2021, and before October 1, 2021 (Form 941 or 941-SS, line 25)

[ . ] − [ . ] = [ . ]

**38.** Qualified family leave wages for leave taken after March 31, 2021, and before October 1, 2021 (Form 941 or 941- SS, line 26)

[ . ] − [ . ] = [ . ]

**39.** Qualified health plan expenses allocable to qualified family leave wages for leave taken after March 31, 2021, and before October 1, 2021 (Form 941 or 941-SS, line 27)

[ . ] − [ . ] = [ . ]

**40.** Amounts under certain collectively bargained agreements allocable to qualified family leave wages for leave taken after March 31, 2021, and before October 1, 2021 (Form 941 or 941- SS, line 28)

[ . ] − [ . ] = [ . ]

Form **941-X** (Rev. 4-2022)

Hope Hospice Inc.

76 – 0704000

Correcting calendar year (YYYY)

2020

**Part 4:   Explain your corrections for this quarter.**

☐ 41.   Check here if any corrections you entered on a line include both underreported and overreported amounts. Explain both your underreported and overreported amounts on line 43.

☐ 42.   Check here if any corrections involve reclassified workers. Explain on line 43.

43.   You must give us a detailed explanation of how you determined your corrections. See the instructions.

See attached letter and contract.

**Part 5:   Sign here. You must complete all five pages of this form and sign it.**

Under penalties of perjury, I declare that I have filed an original Form 941 or Form 941-SS and that I have examined this adjusted return or claim, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

**X**   Sign your name here   _Deb Shaw Stark (signature)_

Print your name here   **Deb Shaw Stark**

Print your title here   **CEO**

Date   **8 / 17 / 2022**

Best daytime phone   **2055420836**

**Paid Preparer Use Only**

Check if you're self-employed   ☐

| | |
|---|---|
| Preparer's name | |
| Preparer's signature | |
| Firm's name (or yours if self-employed) | |
| Address | |
| City | State | |

| | |
|---|---|
| PTIN | |
| Date | /   / |
| EIN | |
| Phone | |
| ZIP code | |

Page **5**

Form **941-X** (Rev. 4-2022)